# COURT OF APPEALS OF WISCONSIN
## PUBLISHED OPINION

Case No.: 2021AP447-CR

Complete Title of Case:

> **STATE OF WISCONSIN,**
>
> **PLAINTIFF-RESPONDENT,**
>
> **V.**
>
> **SHANE ALLAN STROIK,**
>
> **DEFENDANT-APPELLANT.**

| | |
|---|---|
| Opinion Filed: | February 24, 2022 |
| Submitted on Briefs: | November 19, 2021 |

| | |
|---|---|
| JUDGES: | Blanchard, P.J., Graham, and Nashold, JJ. |

| | |
|---|---|
| Appellant ATTORNEYS: | On behalf of the defendant-appellant, the cause was submitted on the briefs of *Tristan S. Breedlove*, assistant state public defender of Madison. |
| Respondent ATTORNEYS: | On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Loryn L. Limoges*, assistant attorney general, and *Joshua L. Kaul*, attorney general. |

COURT OF APPEALS
DECISION
DATED AND FILED

February 24, 2022

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.      **2021AP447-CR**

STATE OF WISCONSIN

Cir. Ct. No.  2016CF321

IN COURT OF APPEALS

STATE OF WISCONSIN,

    PLAINTIFF-RESPONDENT,

  V.

SHANE ALLAN STROIK,

    DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Portage County:  ROBERT J. SHANNON, Judge.  *Reversed and cause remanded*.

Before Blanchard, P.J., Graham, and Nashold, JJ.

¶1      GRAHAM, J.  Shane Stroik appeals a judgment of conviction for first-degree sexual assault of "Amy," who was five years old at the time of the

alleged assault, and an order that denied his postconviction motion for a new trial.[1] Among other things, he argues that his trial counsel provided ineffective assistance of counsel when he (1) failed to object to the prosecutor's statements and arguments as well as the witness testimony about Stroik's "high sex drive" and (2) failed to seek out and introduce evidence from which a jury could find that Amy made a prior untruthful allegation that she had been sexually assaulted by a cousin.

¶2 We conclude that the evidence about Stroik's "sex drive" was propensity evidence that was inadmissible under WIS. STAT. § 904.04. Therefore, had trial counsel objected to the prosecutor's statements and arguments and the witness testimony on this topic, counsel's objections should have been sustained. However, under the circumstances presented here, Stroik has not met his heavy burden to show that counsel's performance was deficient because counsel eventually and adequately addressed the statements, arguments, and evidence about Stroik's "sex drive" during his closing argument.

¶3 Separately, we conclude that Stroik's trial counsel provided ineffective assistance when he failed to seek out and introduce evidence at trial regarding Amy's prior allegation against the cousin, which was addressed in a report by the county child protective services agency. For reasons we explain below, we conclude that counsel's failure to investigate was deficient because it was not based on a reasonable strategic decision. Had counsel conducted a

---

[1] Pursuant to the policy underlying WIS. STAT. RULE 809.86 (2019-20), we use a pseudonym to protect the identity of the alleged victim, "Amy," and her mother, who we refer to as "Laura." All references to the Wisconsin Statutes are to the 2019-20 version.

2

reasonable investigation, the evidence would have been admissible at trial and, if pursued, there is a reasonable probability that the result of the trial would have been different. We therefore reverse the judgment and order, and we remand for a new trial.

## BACKGROUND

¶4      The alleged assault at issue in this case occurred on or around June 10, 2016. At that time, Amy's parents were separated and going through a difficult divorce. Amy's father had sole custody and primary placement. As a result, Amy lived with her father and his girlfriend most days.[2] Amy's mother, "Laura," was residing with and in a romantic relationship with Stroik, and Amy stayed with Laura and Stroik every other weekend.

### The Allegations and Investigation

¶5      Amy's father originally reported the allegation at issue in this case to the family's social worker in July 2016.[3] He reported that, after an incident in which Amy urinated on the floor of her aunt's house, Amy disclosed that Stroik had touched her vagina. The father also reported that Amy's behavior had changed; specifically, she had become more defiant within the last month.

---

[2] By the time of the trial, Amy's father had married the woman who had been his girlfriend at the time of the alleged assault. For the sake of simplicity, we refer to her as Amy's father's girlfriend throughout this opinion.

[3] The social worker was employed by the county department of human services and was working with the family due to what Amy's father referred to at trial, without elaboration, as a "no contact order" between Amy's parents.

¶6    These allegations resulted in an investigation by the county child protective services (CPS) agency. In the course of the investigation, Amy's father drove her to a child advocacy center approximately one month after the alleged assault occurred, and a forensic interviewer conducted a video-recorded forensic interview of Amy, who was five years old.

¶7    At the outset of the interview, immediately upon being asked what was new, Amy said: "I am going to tell you about Shane [Stroik]." She went on to say that, one time when her mother was in the bathroom, Stroik "pull[ed] down [her] pants and touche[d] [her] meme." At that point, Amy pointed to her vagina. The interviewer clarified that Amy used the term "meme" to refer to her vagina.

¶8    Later in the interview, when asked for additional information about how Stroik had touched her "meme," Amy made the following statements. Amy was on the bed watching a movie in the "middle bedroom" when Stroik came into the room. Stroik was "laying on the bed," and he "pulled [her] pants down and touched [her] meme." Before Stroik pulled Amy's pants down, he told her to "turn around" and that he "want[ed] to do something to [her]." Amy said "stop it" but Stroik "didn't stop it." He said, "no, I'm not stopping." He also said "don't tell [your] mom." Stroik touched Amy's "meme" with one hand, either on the "side" or on the "inside" or both, with his hand not moving, and it made her "meme" feel "not good." At some point, Stroik stopped because of "the dog." At one point during the interview, when asked to describe Stroik, Amy indicated that he was bald. However, it is undisputed that Stroik was not bald.[4]

---

[4] It is also undisputed that Amy's paternal grandfather was bald. This point takes on potential significance given facts in the following paragraph of the text.

¶9 In response to a question by the forensic interviewer, Amy said, "It's not just Shane." She stated that her paternal grandfather, who she referred to as her "papa," touched her "meme" on multiple occasions when they slept in the same bed. Amy stated that he would put "his tongue on [her] meme" and move it around, and that he would say, "Don't tell daddy." It is undisputed that Amy's grandfather had died several months before the interview, in March 2016.[5]

¶10 Law enforcement officers interviewed Stroik, Laura, and other potential witnesses. During these interviews, which were memorialized in police reports, Stroik and Laura both told police that Amy had previously made a statement that her paternal cousin had touched her inappropriately. Laura told the police that the allegation about the cousin had been investigated, but nothing came of it. As discussed in greater detail below, Stroik's trial counsel was aware that there had been a CPS investigation into Amy's statements about her cousin's conduct. However, trial counsel did not look further into the matter related to the cousin and did not attempt to introduce evidence at trial about Amy's prior allegation against her cousin.

---

[5] The State filed a pretrial motion to prevent Stroik from introducing evidence at trial about alleged assaults by the grandfather under WIS. STAT. § 972.11(2)(b)3. That statute is commonly referred to as Wisconsin's rape shield law and is discussed in a different context below. However, by the time of the trial, the parties stipulated that the entire video of Amy's forensic interview, including her statements about her grandfather, would be played for the jury. Neither party challenges this stipulation on appeal.

**The Trial**

¶11    Stroik was charged with committing a single sexual assault against Amy.[6]  Following several pretrial hearings and adjournments, the case proceeded to a three-day jury trial in 2018.  Multiple witnesses testified, including Amy, Amy's aunt, Amy's father, Amy's father's girlfriend, Laura, law enforcement and CPS employees who had been involved in the investigation, and Stroik.  We do not attempt to summarize all the evidence introduced and arguments made at trial; we instead summarize only those portions of the trial that are necessary background to understand the issues we address below.

¶12    During his opening statement and closing argument, the prosecutor made several comments about Stroik's "sex drive."  By way of example, during his opening statement, the prosecutor asserted that Stroik had a "very high sex drive" and therefore, according to the prosecutor, "the presumption of course is that [he touched Amy] for a sexual purpose."  To give another example, during trial, the prosecutor questioned Laura about aspects of her sex life with Stroik and the frequency with which Stroik wanted to have sexual relations with Laura.  We discuss the prosecutor's statements and arguments and the trial testimony about Stroik's "sex drive"—and trial counsel's response to the statements, arguments, and testimony—at length in the discussion section below.

---

[6] More specifically, Stroik was charged with violating WIS. STAT. § 948.02(1)(e), which provides in relevant part:  "Whoever has sexual contact … with a person who has not attained the age of 13 years is guilty of a class B felony."  During the course of the State's investigation, another young girl told law enforcement that Stroik had touched her vagina on one occasion, the State charged Stroik with a second violation of § 948.02(1)(e), and the charges were joined for trial.  The jury ultimately acquitted Stroik of the charge related to the second victim.  On appeal, neither party suggests that the second allegation and acquittal are material to the issues in this appeal, and we address the facts related to that charge no further.

¶13    Amy's aunt testified that, on one occasion when she was babysitting Amy, Amy urinated on the floor.  Amy's aunt, Amy's father, and Amy's father's girlfriend all testified about a subsequent conversation they collectively had with Amy, during which, upon questioning, Amy said that Stroik had touched her "meme."

¶14    Amy's recorded CPS interview was played for the jury in its entirety.  After the video was played, Amy, who was seven years old by the time of trial, was subject to direct examination by the prosecutor and cross-examination by Stroik's trial counsel, which was followed by another round of direct examination and cross-examination.[7]

¶15    During her testimony, Amy did not appear to have any clear memory of the assault.  When the prosecutor initially asked Amy if she knew "why we're here today," she responded, "No."  Amy went on to testify that she remembered "going to talk to a lady [that is, the forensic investigator] about something that happened with Shane [Stroik]," but that she did not remember anything happening between her and Stroik.  The direct examination proceeded in pertinent part as follows:

> [Prosecutor:]  But you remember talking to that lady about it?
>
> [Amy:]  Yes.
>
> [Prosecutor:]  Do you remember telling that lady that something happened with Shane?

---

[7]   *See* WIS. STAT. § 908.08 (providing a process by which, after notice and a hearing in which the circuit court makes certain findings of fact, the testimony of a child who is available to testify may be presented by audiovisual recording, provided that the child will be immediately available for cross-examination).

> [Amy:]  No.
>
> [Prosecutor:]  Do you remember that something happened with Shane?
>
> [Amy:]  No.
>
> [Prosecutor:]  Do you know if Shane ever did anything to you that you didn't like?
>
> [Amy:]  No.
>
> [Prosecutor:]  No.  Do you remember anything like that?  Do you remember any time that Shane did something you didn't like?
>
> [Amy:]  I don't know.
>
> [Prosecutor:]  I'm sorry, can you say that a little bit louder?
>
> [Amy:]  I don't know.

¶16    Later, in response to the prosecutor's questioning on re-direct, Amy testified that she remembered telling "the lady" that Stroik "touched my private." When the prosecutor asked if that was "true," Amy responded, "Yes."  However, during her re-cross-examination, Amy testified that she did not know where "it happened" and that it was not in "the play room."[8]  She further testified that she did not know whether Stroik had "touched" her:

> [Trial counsel:]  And so you don't remember anything that happened when you said Shane touched you, right?
>
> [Amy:]  No.
>
> [Trial counsel:]  And you don't even remember if he did or didn't, do you?

---

[8] Based on other evidence introduced at trial, it is apparent that the "middle bedroom" that Amy referred to when talking to the forensic investigator, as referenced above, is the same room that Amy testified about as the "play room."

[Amy:] No, I do not.

By contrast, Amy testified unambiguously that her "papa" (that is, her paternal grandfather) "did some pretty bad things" to her, and that she remembered those things happening.

¶17 When Stroik testified, he denied that he had ever touched Amy for sexual gratification. He testified that he generally believed that Amy was a "pretty truthful" kid, but that she had not been truthful about the allegations she made against him.

¶18 The jury found Stroik guilty of first-degree sexual assault.

**The Postconviction Proceedings**

¶19 Stroik filed a postconviction motion seeking a new trial on several grounds. Among other things, he challenged his trial counsel's handling of the prosecutor's statements and witness testimony about his "high sex drive."[9] Additionally, he argued that he was entitled to postconviction discovery regarding Amy's alleged prior statements about inappropriate touching by her cousin. To this end, Stroik asked the circuit court to conduct an in camera review of a confidential CPS report that had been compiled four months before Stroik allegedly assaulted Amy and that "likely contains relevant and material evidence,

---

[9] Stroik's postconviction motion also alleged that his trial counsel was ineffective for failing to impeach Amy's aunt with a prior conviction; that the circuit court erred by failing to properly strike testimony that commented on the credibility of witnesses in violation of *State v. Haseltine*, 120 Wis. 2d 92, 97, 352 N.W.2d 673 (Ct. App. 1984); and that he was entitled to a new trial in the interest of justice. Although Stroik renews these additional arguments on appeal, we do not address them because we determine that Stroik is entitled to a new trial based on another ground. *Barrows v. American Fam. Ins. Co.*, 2014 WI App 11, ¶9, 352 Wis. 2d 436, 842 N.W.2d 508 (2013) (an appellate court need not address nondispositive issues).

specifically [Amy's] prior untruthful allegation of sexual assault." We refer to this document as the "CPS report" throughout the opinion.

¶20 The circuit court held a ***Machner*** hearing, and trial counsel testified at the hearing.[10] The court determined that Stroik was not entitled to relief on his claim about the "sex drive" evidence or any of the other claims presented in his postconviction motion. We recount pertinent aspects of trial counsel's testimony and the court's decision as needed below.

¶21 Regarding Stroik's request for an in camera review of the CPS report, the circuit court initially referred the matter to the juvenile court to determine whether the CPS report was discoverable.[11] The juvenile court determined that, if the contents of the CPS report were relevant to the issues at Stroik's trial, the report "would be admissible as an exception" to Wisconsin's rape shield law.[12]

---

[10] *See **State v. Machner***, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979). A ***Machner*** hearing is "[t]he evidentiary hearing to evaluate counsel's effectiveness, which includes counsel's testimony to explain his or her handling of the case." ***State v. Balliette***, 2011 WI 79, ¶31, 336 Wis. 2d 358, 805 N.W.2d 334.

[11] *See* WIS. STAT. §§ 48.396 and 48.78; ***State v. Bellows***, 218 Wis. 2d 614, 629-30, 582 N.W.2d 53 (Ct. App. 1998) (providing factors for the juvenile court to consider before releasing confidential juvenile records). On appeal, neither party challenges the circuit court's decision to send the matter to the juvenile court for the ***Bellows*** determination or the determination made by the juvenile court that the CPS report was discoverable in this criminal case.

[12] *See* WIS. STAT. §972.11(2)(b) (providing a general bar against the admission of "any evidence" of a sexual assault complainant's "prior sexual conduct"); *but see* § 972.11(2)(b) (providing an exception for evidence of prior untruthful allegations of sexual assault by the alleged victim). As is the case with any of the statutory exceptions to the rape shield law, evidence of prior untruthful allegations is also subject to WIS. STAT. § 971.31(11), which provides that the circuit court may not allow the evidence unless it first determines that the proffered evidence is "material to a fact at issue in the case and of sufficient probative value to outweigh its inflammatory and prejudicial nature before it may be introduced at trial."

¶22    The circuit court then conducted an in camera review of the CPS report, which was eventually released to the parties and is part of the record in this appeal. The report included the following information. It summarized CPS's investigation into "alleged sexual abuse of [Amy], age 5, by her male paternal cousin, … age 9." The allegation was originally reported to CPS by Amy's mother, Laura, in February 2016. Laura reported that Amy told Laura that Amy's cousin "touched her 'mimi' approximately two weeks ago" and that "[Amy] told [him] to stop and he would not." However, when interviewed by a CPS social worker, Amy "denied that [her cousin] touched her 'mimi' or any other part of her body."[13] According to the report, Amy told the social worker "that she did tell her mother [that her cousin had touched her], but then indicated she didn't know why she told her mother that." Following its investigation, CPS determined that the allegation would "be entered as unsubstantiated" because Amy told the social worker that the statement she made that led to the investigation was inaccurate and because CPS was aware of no other evidence to support the original allegation.

¶23    Following its in camera review, the circuit court determined that the CPS report "contains relevant information material to the defense relating to … whether [Amy] made a prior untruthful allegation of sexual abuse." The CPS report was released to the parties under seal.

¶24    Stroik filed a supplement to his postconviction motion, which addressed the contents of the CPS report. His supplemental motion argued, among

---

[13] The author of the CPS report transcribed the word that Amy used to describe her vagina using different spelling than was used in the transcripts and other documents from Stroik's trial. It is nevertheless apparent that in both situations, Amy was using the same word to describe the same body part.

11

other things, that his trial counsel had been ineffective for failing to seek and introduce the CPS report during Stroik's trial.[14] The circuit court denied the supplemental motion, determining that counsel had not been ineffective because counsel pursued a reasonable trial strategy of focusing on the sexual abuse by Amy's grandfather. Stroik appeals.

## DISCUSSION

¶25 Stroik raises many arguments on appeal, but we focus our discussion on his arguments that trial counsel was ineffective in two respects: first regarding the prosecutor's statements and arguments as well as the witness testimony about his "high sex drive"; and second, regarding the CPS report.

¶26 A criminal defendant is guaranteed the right to the assistance of counsel by the Wisconsin Constitution, *see* WIS. CONST. art. I, § 7, and the United States Constitution, *see* U.S. CONST. amend. VI. *State v. Klessig*, 211 Wis. 2d 194, 201-02, 564 N.W.2d 716 (1997). "'[T]he right to counsel is the right to the *effective* assistance of counsel.'" *Strickland v. Washington*, 466 U.S. 668, 686 (1984) (quoted source omitted). To prevail on a claim of ineffective assistance of counsel, a defendant has the burden to prove that trial counsel's performance was deficient, and also, that the deficiency prejudiced the defendant. *Id.* at 687.

---

[14] In his supplemental motion, Stroik also argued that the State violated *Brady v. Maryland*, 373 U.S. 83 (1963), when it failed to turn over the CPS report in pretrial discovery. Although Stroik renews this argument on appeal, we do not address it further because we determine that Stroik is entitled to a new trial based on another ground. *Barrows*, 352 Wis. 2d 436, ¶9.

¶27 When evaluating whether trial counsel's performance was deficient, we "apply[] a heavy measure of deference to counsel's judgment," *id.* at 690-91, making "every effort" to "evaluate the [representation] from counsel's perspective at the time" and to "eliminate the distorting effects of hindsight," *id.* at 689. Counsel enjoys a "strong presumption" that his conduct "falls within the wide range of reasonable professional assistance," *id.*, and counsel's performance "'need not be perfect, indeed not even very good, to be constitutionally adequate,'" *State v. Thiel*, 2003 WI 111, ¶19, 264 Wis. 2d 571, 665 N.W.2d 305 (quoted source omitted). To demonstrate deficient performance, the defendant must show that his counsel's representation "fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688.

¶28 When evaluating whether trial counsel's performance prejudiced the defendant, we consider whether there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Such a probability "exists when there is 'a "substantial," not just "conceivable," likelihood of a different result.'" *State v. Cooper*, 2019 WI 73, ¶29, 387 Wis. 2d 439, 929 N.W.2d 192 (quoted source omitted).

¶29 "Whether counsel's actions constitute ineffective assistance presents a mixed question of law and fact." *State v. Tourville*, 2016 WI 17, ¶16, 367 Wis. 2d 285, 876 N.W.2d 735. We uphold the circuit court's factual findings "'concerning circumstances of the case and counsel's conduct and strategy'" unless those findings are clearly erroneous. *State v. Silva*, 2003 WI App 191, ¶16, 266 Wis. 2d 906, 670 N.W.2d 385 (quoted source omitted). Whether counsel's performance was deficient and prejudicial are both questions of law that we review de novo. *State v. Pitsch*, 124 Wis. 2d 628, 634, 369 N.W.2d 711 (1985).

¶30    We begin by addressing the prosecutor's statements and arguments as well as the witness testimony about Stroik's "high sex drive." After concluding that the "sex drive" evidence was inadmissible propensity evidence and that trial counsel could have successfully moved to prevent its admission, we nevertheless conclude that Stroik has not proven that counsel was deficient with respect to that evidence. We then address Stroik's argument that counsel was ineffective for failing to seek out the CPS report and introduce evidence at trial regarding Amy's prior allegation about a cousin. We conclude that Stroik is entitled to a new trial on that basis.

## I.  The "Sex Drive" Evidence[15]

¶31    The topic of the magnitude of Stroik's "sex drive" came up three times during the trial, and we provide additional background about those incidents. The first time was during the State's opening statement. The prosecutor told the jury that Stroik "has a very high sex drive. And so, the presumption of course is that [the alleged assault] was for a sexual purpose." Trial counsel did not object to the prosecutor's statement, and he was silent on that topic during his own opening statement.

---

[15] Given our conclusion that Stroik is entitled to a new trial on another ground, we could decline to address the use of the "sex drive" evidence during his trial. We nevertheless take the opportunity to address it here and provide guidance for two reasons. First, the role of character and other acts evidence is a frequently litigated topic, the parties have fully briefed the issue, and this case provides a helpful example of a situation in which the evidence is not relevant for any permissible purpose and is relevant only to prove propensity. Second, we are remanding for a new trial, and issues about the admissibility of evidence and argument of this type could arise following the remand.

¶32     The second time was during the prosecutor's direct examination of Laura, which occurred on the first day of the trial.  Laura testified that Stroik was a "very sexual person," that he "always wanted sex," and that they would have sex "daily," even if Laura did not want to have sex because her kids were around:

> [Prosecutor]:  … when you met with [law enforcement], they asked you questions about your sex life with Shane [Stroik], is that right?
>
> [Laura]:  Yes.
>
> [Prosecutor]:  Do you remember saying that Shane is a very sexual person?
>
> [Laura]:  Yes.
>
> [Prosecutor]:  Do you remember saying that it was more sex than you ever had before?
>
> [Laura]:  Yes.
>
> [Prosecutor]:  Do you remember saying that's true?
>
> [Laura]:  Yes.
>
> [Prosecutor]:  And can you describe for us, what do you mean by that?
>
> [Laura]:  He always wanted sex.
>
> [Prosecutor]:  Okay.  So how often would you have sex?
>
> [Laura]:  Daily.
>
> [Prosecutor]:  And even when your kids were there?
>
> [Laura]:  Yes.
>
> [Prosecutor]:  Do you remember telling Detective Tracy that when your kids were there, you would tell him you didn't want to?
>
> [Laura]:  Yes.

After that line of questioning, the prosecutor asked Laura about Stroik's use of pornography.[16] Trial counsel did not object to any of this questioning.

¶33    The third and final time that Stroik's "high sex drive" was addressed at trial was on the third day, during closing arguments. The prosecutor argued that Stroik "is described by [Laura], his former girlfriend, as a very sexual person. They had a lot more sex than she's ever had before. There's all this stuff about pornography being discussed." The prosecutor concluded this portion of his closing argument by telling the jury: "I don't know how [the alleged assault of Amy] could be for something other than for a sexual purpose."

¶34    This time, although trial counsel did not object to the prosecutor's argument, he addressed the topic in his own closing argument. Counsel argued:

> The State, in the end and in its opening, said that because Shane Stroik is highly sexual or watches pornography, he somehow molested [Amy].
>
> Ladies and gentlemen, that's an absolute falsehood. That's an absolute lack of understanding of the issue of sexual assault of children.…
>
> ….
>
> You have to have a sexual attraction to a child to commit an act of sexual assault of a child.…
>
> … And who was attracted to the child? The person that [Amy] had sexual contact by, her papa. The person who was described by [Amy] by being bald. The person that [Amy] remembered.

---

[16] It appears to be undisputed that the pornography in question did not involve children. To be clear, there is no suggestion in any aspect of the record that Stroik has ever possessed or viewed child pornography.

¶35 With this background in mind, we now consider whether trial counsel's performance was deficient. Stroik argues that his counsel should have objected to the prosecutor's statements and the witness testimony about his allegedly "high sex drive" (or, at the very least, counsel should have requested an instruction cautioning the jury about how it could and could not consider this evidence). Stroik contends that counsel's failure to do so constituted deficient performance. The State's argument is difficult to discern. Although it makes a passing and unsupported assertion that the evidence may have been admissible to prove "intent," the State's primary argument appears to be that the "sex drive" evidence and argument was so obviously irrelevant that it could not have improperly swayed the jury.

¶36 An attorney's performance may be deficient if the attorney could have prevented the admission of evidence by making a timely objection but failed to do so. *State v. Domke*, 2011 WI 95, ¶46, 337 Wis. 2d 268, 805 N.W.2d 364. However, an attorney's failure to make an objection that would have been properly overruled by the court is not deficient performance. *See State v. Berggren*, 2009 WI App 82, ¶21, 320 Wis. 2d 209, 769 N.W.2d 110. This is because attorneys are generally not required to advance losing arguments. *State v. Cameron*, 2016 WI App 54, ¶27, 370 Wis. 2d 661, 885 N.W.2d 611 ("It is not deficient performance for counsel not to make a pointless objection."). Therefore, in considering whether trial counsel's failure to object to the statements, arguments, and testimony on this topic was deficient performance, we consider whether the evidence was admissible under Wisconsin's rules of evidence.

¶37 Stroik contends that the evidence about his "sex drive" was general character evidence, which was inadmissible pursuant to WIS. STAT. § 904.04(1). He argues that his interest in having sex with age-appropriate women was not

17

relevant to the charge that he had sexual contact with a five-year-old child, and that the prosecutor was in effect urging the jury to make the unfounded and unfairly prejudicial inference that Stroik had a deviant character trait that made it more likely that he would sexually assault a child. In its response, the State asserts that the prosecutor offered the "sex drive" evidence as "other acts" evidence to prove intent, and that, during the postconviction proceedings, the circuit court determined that it had been admissible for that purpose under § 904.04(2).[17]

¶38　We begin with a brief explanation of the meaning of the term "propensity inference," and its relationship to the evidentiary rules set forth in WIS. STAT. § 904.04. A "propensity inference" is the inference that a person acted "'in conformity with a particular character trait'" on a specific occasion. *State v. Tabor*, 191 Wis. 2d 482, 490, 529 N.W. 2d 915 (Ct. App. 1995) (quoted source omitted).

¶39　WISCONSIN STAT. § 904.04 provides rules for how and when propensity evidence can be used during a trial. With exceptions that are inapplicable here,[18] § 904.04(1) (which addresses character evidence generally)[19]

---

[17] Decisions about the admissibility of other acts evidence are often made pretrial, following a motion by the proponent requesting a ruling on its admissibility. Here, the State filed a pretrial motion seeking a ruling on the admissibility of different "other acts" evidence, but it did not file a pretrial motion seeking a ruling on the "sex drive" evidence. The State's failure to seek a pretrial ruling on the admissibility of this evidence undermines any suggestion that the prosecutor considered the "sex drive" evidence to be admissible as other acts evidence.

[18] *See, e.g.*, WIS. STAT. § 904.04(1)(a)-(c) (providing three specific circumstances in which general character evidence is admissible to prove propensity, none of which are applicable here); *see also* § 904.04(2)(b)2. (addressing the use of prior convictions for first degree sexual assault and first degree sexual assault of a child for purposes of proving propensity during a subsequent prosecution for first degree sexual assault or first degree sexual assault of a child); *see also State v. Dorsey*, 2018 WI 10, 379 Wis. 2d 386, 906 N.W.2d 158 (interpreting WIS. STAT. § 904.04(2)(b)1. and 2.).

and § 904.04(2) (which addresses other acts evidence)[20] both prohibit the admission of evidence of a person's *character trait* for the purpose of proving that person's *propensity* to act in conformity with that character trait.[21] An application of these rules is that the prosecution cannot introduce evidence of a "deviant character trait of the defendant" during a criminal trial and ask the jury to infer that the defendant acted in conformity with that character trait on the charged occasion. *Tabor*, 191 Wis. 2d at 492.

¶40 One reason for these rules is the "overstrong tendency [of a jury] to believe the defendant guilty of the charge merely because [the defendant] is a person likely to do such acts." *Whitty v. State*, 34 Wis. 2d 278, 292, 149 N.W.2d 557 (1967). "[A]n invitation to focus on an accused's character" rather than on the accused's conduct on a specific occasion "magnifies the risk that jurors will punish the accused for being a bad person regardless of his or her guilt of the crime charged." *State v. Sullivan*, 216 Wis. 2d 768, 783, 576 N.W.2d 30 (1998).

---

[19] WISCONSIN STAT. § 904.04(1) prohibits the admission of "[e]vidence of a person's character or a trait of the person's character … *for the purpose of proving that the person acted in conformity therewith on a particular occasion*," with three exceptions that are inapplicable here. (Emphasis added.)

[20] WISCONSIN STAT. § 904.04(2)(a) provides, in pertinent part: "Except as provided in para. (b)2., [which is inapplicable here,] evidence of other crimes, wrongs, or acts *is not admissible to prove the character of a person in order to show that the person acted in conformity therewith*." (Emphasis added.) However, subsec. (2)(a) "does not exclude the evidence when offered for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

[21] *See State v. Payano*, 2009 WI 86, ¶55, 320 Wis. 2d 348, 768 N.W.2d 832 (citing 7 DANIEL D. BLINKA, WISCONSIN PRACTICE SERIES: WISCONSIN EVIDENCE § 404.101 at 146 (3d ed. 2008) for the proposition that WIS. STAT. § 904.04 "governs the admissibility of character evidence as circumstantial evidence of conduct as well as the admissibility of 'other acts' to prove something *other* than character" (emphasis added)).

¶41 For reasons we now explain, we conclude that the testimony about Stroik's "sex drive" is best described as general character evidence that was inadmissible pursuant to WIS. STAT. § 904.04(1). However, to the extent that it could be characterized as evidence of other acts governed by § 904.04(2), it was not relevant to prove intent. Whether described as general character evidence or other acts evidence, the prosecutor used the evidence for the purpose of asking the jury to infer that Stroik had a character trait that would make it more likely that he would sexually assault a child, and as such, it was propensity evidence that was barred by § 904.04(1) and (2) alike.

¶42 Although our statutes do not define the term "character," a leading Wisconsin treatise explains that the term refers broadly to the "labels we attach to other people" to describe their "disposition or generalized propensity to behave in a certain manner." 7 DANIEL D. BLINKA, WISCONSIN PRACTICE SERIES: WISCONSIN EVIDENCE § 404.101 at 172, 171 (4th ed. 2017). In this case, the prosecutor's statements and Laura's testimony about Stroik's "sex drive" did not focus on any specific instances of his past conduct. Instead, while the testimony purported to address multiple prior acts, the substance of the testimony and the way it was used was directed at the kind of person Stroik is—a "very sexual" person who "always wanted sex." Although the State asserts in passing that the "sex drive" evidence could be characterized as "other acts" evidence, its assertion is conclusory, and the State does not develop any argument to support that characterization. We agree with Stroik that, as it was used here, the "sex drive" evidence introduced at trial is best described as general character evidence. This determination is significant because, unlike other acts evidence, general character evidence is not subject to the greater latitude rule or the exception for proving intent. *Compare* WIS. STAT. § 904.04(1) *with* § 904.04(2)(a) and (b).

¶43    However, even if some portions of the "sex drive" evidence could be characterized as other acts evidence, we now explain why it was not admissible under WIS. STAT. § 904.04(2).

¶44    As stated above, evidence of other acts may be admissible for a non-propensity purpose, including proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.  WIS. STAT. § 904.04(2)(a).  When a party seeks to introduce other acts evidence for a non-propensity purpose, admissibility is determined under the three-pronged test established in *Sullivan*, 216 Wis. 2d at 789.  The proponent of the evidence must demonstrate that:  (1) the other acts evidence is offered for a permissible non-propensity purpose; (2) it is relevant to that purpose; and (3) its probative value is not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.  *Id.*  Additionally, in cases involving charges that include child sexual assault, other acts evidence may be admitted with "greater latitude."  *See Tabor*, 191 Wis. 2d at 488; *see also* § 904.04(2)(b).

¶45    In this case, the State asserts that the prosecutor introduced the "sex drive" evidence to prove Stroik's intent to sexually assault Amy, but the State does not develop any argument to support the proposition that the evidence was relevant to or probative of that purpose.  Nor does the State argue that it was offered for or relevant to any other permissible non-propensity purpose under WIS. STAT. § 904.04(2)(a).

¶46    At trial, the State was required to prove that Stroik touched Amy "for the purpose" of "arousing or gratifying" himself.  WIS. STAT. § 948.01(5)(a).

Under some circumstances, specific instances of a defendant's other conduct may be admissible for that purpose. The **Tabor** case provides a helpful illustration of such a situation. In **Tabor**, the defendant was charged with molesting a five-year-old boy. **Tabor**, 191 Wis. 2d at 487. He had previously molested a nine-year-old girl, and the prosecutor argued that evidence of the prior assault was admissible to prove Tabor's "intent" and "motive" in the charged case. **Id.** The circuit court agreed that evidence of the prior assault was relevant for that purpose. **Id.** at 494. It explained that the prosecutor had to prove that Tabor was "motivated by a desire for sexual gratification," and that the evidence of the prior assault is "directly pertinent" to that element because "most folks wouldn't even remotely consider it sexually gratifying to have sexual relations with a small child." **Id.** On appeal, we affirmed the circuit court's exercise of discretion, explaining that the prior conduct was not introduced for the impermissible purpose of proving propensity, but was instead for the acceptable purpose of proving intent. **Id.** at 494-95.

¶47    Here, by contrast, the State does not argue that evidence of Stroik's sexual interest in his age-appropriate girlfriend is directly relevant to whether he would be sexually gratified by touching a child under the circumstances described in WIS. STAT. § 948.01(5)(a). We agree with the argument that trial counsel eventually made in his closing argument—the fact that Stroik was allegedly interested in frequent sex with Laura was not relevant to or probative of whether he would be sexually gratified by a prohibited touching of a five-year-old child. Therefore, unlike in **Tabor**, the evidence introduced about Stroik's "sex drive" was not at all relevant to the intent element of the sexual assault crime charged in this case. Accordingly, even if the testimony about Stroik's "sex drive" could be properly described as evidence of his other acts, it would not have been admissible under WIS. STAT. § 904.04(2) to show intent. Nor would it have been admissible

22

under the greater latitude rule, which pertains to "evidence of any similar act[] by the accused." *See* § 904.04(2)(b)1.[22]

¶48 In sum, whether the evidence about Stroik's "sex drive" is considered to be "character evidence generally" or evidence of "other crimes, wrongs, or acts," the prosecutor should not have been allowed to present evidence that Stroik was a "sexual" person. The "sex drive" evidence was not relevant for any permissible purpose. The only conceivable purpose of introducing it was to ask the jury to make a strained inference that, because Stroik was allegedly a very sexual person who sought sex from his girlfriend on a daily basis, he was the type of person who would sexually assault a child. This is the propensity inference that is forbidden by WIS. STAT. § 904.04(1) and (2) alike.[23] We therefore conclude that, had trial counsel objected to the comments that the prosecutor made in his opening statement, his questioning of Laura, or his closing argument, the circuit court would have—or at least should have—sustained the objections.

¶49 Our analysis of whether trial counsel's performance was deficient does not end with our determination that trial counsel could have successfully

---

[22] In reaching this conclusion, we respectfully disagree with the determinations made by the circuit court judge during the postconviction hearing. In its oral ruling on this issue, the court said that, although the line between character and other acts evidence can be difficult to determine, the evidence about Stroik's "sex drive" could be considered other acts evidence and was admissible under the greater latitude rule because it was relevant and probative of intent.

[23] As the Wisconsin treatise on evidence explains, "[i]t is one thing to be solicitous toward the use of such proof [of other acts evidence for permissible purposes]; it is quite another to turn a blind eye toward its misuse as bad character/propensity evidence." 7 BLINKA, *supra* § 404.402 (4th ed. Supp. 2019); *see also* **State v. Plymesser**, 172 Wis. 2d 583, 592, 493 N.W.2d 367 (1992) (other acts evidence will not be admitted under § 904.04(2) "when the only inference that can be drawn from that evidence is that 'because a defendant committed prior act X, he is therefore of such a character and disposition to commit present act Y'" (quoted source omitted)).

prevented the admission of the "sex drive" evidence. Here, although counsel did not object to the statements and evidence on this topic, he did eventually address the statements and evidence during his closing argument. And when he finally did so, counsel was unequivocal. As stated above, counsel argued that the propensity inference that the prosecutor was asking the jury to draw was an "absolute falsehood" based on "an absolute lack of understanding of the issue of sexual assault of children." He argued that "[y]ou have to have a sexual attraction to a child to commit an act of sexual assault of a child," and he used the opportunity to further his strategy of blaming the alleged assault by Stroik on the grandfather.

¶50    Thus, this is not a case in which counsel allowed inadmissible and prejudicial evidence to be admitted during the trial and did nothing to counter it. As the circuit court explained following the *Machner* hearing, counsel believed that the evidence was irrelevant, and "he argued that to the jury." With the benefit of hindsight, it may have been preferable for counsel to raise this issue when it arose on the first day of trial. Nevertheless, a defendant is not entitled to perfect representation. *Thiel*, 264 Wis. 2d 571, ¶19. Consequently, while we are troubled by the amount of character evidence that entered into this trial, we conclude that counsel's decision to counter the "sex drive" evidence with a targeted, common sense, and potentially persuasive argument rather than an objection or request for a cautionary instruction was within the "wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. Therefore, we conclude that Stroik has not met his burden to show that his counsel's performance was deficient. *See Strickland*, 466 U.S. at 700 ("Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim.").

24

## II. The CPS Report

¶51 We now address Stroik's argument that trial counsel was ineffective for failing to obtain a CPS report that detailed the investigation into Amy's prior statement that she was sexually assaulted by her paternal cousin.

¶52 We begin by providing additional background about the CPS report. As discussed above, Laura reported to CPS that Amy said that a cousin "touched her mimi," that Amy told the cousin to stop, and that he would not stop. However, when a CPS social worker interviewed Amy, CPS reported that Amy denied that her cousin had touched her. In fact, according to CPS, Amy denied that anyone had ever touched her inappropriately. Amy acknowledged to CPS that she told Laura that her cousin touched her, and she said she did not know why she had made that statement.

¶53 CPS ended its investigation, concluding that the allegation against the cousin was "unsubstantiated." As the author of the CPS report explained, the allegation was determined to be unsubstantiated because Amy indicated that her initial report to Laura was not true, and CPS was not aware of any other evidence to corroborate the report. However, the record contains an alternative explanation for Amy's changed story. According to Laura's statement to the police following Stroik's arrest, Amy denied the allegations to CPS because "her daddy told her to say that [her cousin] didn't do it."

¶54 During the *Machner* hearing, trial counsel was questioned about his reasons for not pursuing the CPS report. Counsel testified that he "vaguely" recalled from the police report that Amy had reported that her cousin had sexually assaulted her. Counsel testified that he "did not recall talk[ing] to anyone about whether the allegation ever occurred," and that he "assumed it didn't occur, and

basically the [circuit court] wasn't going to let [him] get it in." Counsel testified that his overall strategy was "focused on other issues," specifically, the alleged sexual assaults by Amy's paternal grandfather, which "everybody took … for a fact." Counsel explained that his trial strategy was "to blame" the grandfather for the sexual assaults that Amy attributed to Stroik in her video interview.

## A. Deficient Performance

¶55 The parties dispute whether trial counsel's failure to obtain the CPS report constituted deficient performance. Stroik argues that trial counsel performed deficiently by not obtaining the CPS report in pretrial discovery, and that it would have been admissible at trial under WIS. STAT. § 972.11(2)(b)3., which, as discussed above, allows the admission of prior false allegations of sexual assault by the alleged victim. He contends that the contents of the report would have been helpful to his defense. He further contends that, had counsel sought out the report and used it at trial, it would have enhanced counsel's chosen trial strategy. The State's primary argument to the contrary is devoted to its assertion that evidence of Amy's prior allegation would not have been admissible at trial.

¶56 For reasons we now explain, we agree with Stroik that, had his trial counsel sought out the CPS report in pretrial discovery, it would have eventually been released. We further agree that evidence of Amy's prior allegations against her cousin would have been admissible at trial, and that Stroik's counsel would have been able to use the evidence to suggest that the abuse that Amy allegedly suffered from her grandfather had resulted in a false allegation against another male relative.

26

¶57　The State asserts that "the CPS report does not conclusively establish [Amy] lied or made a prior untruthful allegation." Although this assertion is accurate, conclusive proof is not required under WIS. STAT. § 972.11(2)(b)3. As our supreme court explained in *State v. Ringer*, 2010 WI 69, ¶30, 326 Wis. 2d 351, 785 N.W.2d 448, evidence of a prior false allegation is admissible if it is "sufficient to support a *reasonable person's finding* that the complainant made prior untruthful allegations." (Emphasis in original.) The question is not whether the circuit court "is convinced by a preponderance of the evidence" that the prior allegations were false, but rather, whether "a jury, acting reasonably, could find that it is more likely than not that the complainant made prior untruthful allegations of sexual assault." *Id.*, ¶32. The evidence may satisfy this standard if, for example, the prior allegation "'is later recanted by the complainant'" or there is other evidence from which the jury "could reasonably find" that the prior allegations were false. *Ringer*, 326 Wis. 2d 351, ¶39 (quoted source omitted).

¶58　Here, Amy herself made contradictory statements about whether her cousin had assaulted her, and she expressly recanted her prior accusation about her cousin during her interview with the CPS social worker.[24] The State points to Laura's statement to police after Stroik's arrest and argues that Amy may have had a different motivation for recanting—that "her daddy told her to say that [her

---

[24] In this respect, the unsubstantiated report in this case is unlike the unsubstantiated allegations in two cases relied upon by the State. In *State v. Leather*, No. 2010AP354, unpublished slip op. (WI App April 5, 2011), and *State v. Jones*, No. 2013AP1731, unpublished slip op. (WI App July 30, 2014), there was no evidence that the alleged victim later disavowed an initial allegation, nor was there any other evidence from which the jury could find that the prior allegation was false.

cousin] didn't do it." But again, the question was not whether the circuit court would have been "convinced by a preponderance of the evidence" that Amy's prior allegations were false. *Id.*, ¶32. We conclude that, based on Amy's recantation, "a jury, acting reasonably, could find that it is more likely than not that the complainant made prior untruthful allegations of sexual assault." *Id.* Our conclusion is bolstered by: (1) the post-trial determination by the juvenile court that, if relevant, the CPS report would have been admissible under the exception to the rape shield law; and (2) the post-trial determination by the circuit court that it was relevant evidence of whether Amy had made a prior false allegation.

¶59 Having concluded that the CPS report was admissible, we further conclude that, had trial counsel sought out the CPS report, he would have determined that its contents were material to Stroik's defense. Amy's initial statements about alleged assaults by her cousin and by Stroik were quite similar— in both instances, she reported that her assailant put his hand on her vagina, she told the assailant to stop, and the assailant did not stop. Accordingly, the CPS report contained evidence that, several months before Amy made her report about Stroik, she made a very similar allegation against her cousin that she later denied was true.

¶60 The circuit court determined that counsel made a reasonable strategic decision to focus the defense "on allegations involving prior abuse by the child's grandfather and not her cousin." To the extent that the circuit court determined that counsel's failure to seek out the CPS report was not deficient because it was based on a strategic choice, that conclusion is clearly erroneous because it is not supported by law or fact.

¶61     As the State acknowledges, "[s]trategic choices made after less than complete investigation are reasonable only to the extent that reasonable professional judgment supports the limitations on the investigation." *See Strickland*, 466 U.S. at 691 ("counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary"); *Thiel*, 264 Wis. 2d 571, ¶¶46, 50 (concluding that "it was objectively unreasonable for [trial] counsel not to pursue further evidence to impeach" the alleged victim's credibility).   Here, trial counsel was aware of Amy's statement about her cousin.  Counsel understood that prior false allegations were admissible pursuant to an exception to the rape shield law, and in any event, this exception is not an unsettled or obscure area of the law.  Counsel may have "assumed" that "the [circuit court] wouldn't let [him] get it in," but without knowing what the CPS report contained, this assumption is unsupported by any reasonable professional judgment.  Trial counsel's unsupported assumption that evidence of the prior allegation would be inadmissible was therefore not a reasonable strategic decision and is not entitled to any deference.

¶62     We agree with the circuit court's general assessment that trial counsel's overall defense strategy to "blame" the grandfather was reasonable.  However, the court's discussion about that strategy misses the point—as stated above, counsel did not have a reasonable basis for foregoing an investigation.[25]

---

[25] The circuit court's discussion of trial counsel's strategy was general and did not purport to come to grips with the advantages of obtaining and potentially using the information from the CPS report at trial.  The court stated that "[c]ounsel's strategy at trial was coherently explained at the hearing on this motion and was appropriately carried out at trial which is clearly born-out by the child-victim's uncertainty as to her recollection of the abuse."  The court stated that, "on the basis of the information which [counsel] possessed concerning the incident involving the child-victim's cousin," the court could not conclude that counsel's "decision to focus the
(continued)

And, as it turned out, the CPS report contained information that was not only material but also could have significantly enhanced counsel's chosen strategy. Trial counsel wanted the jury to conclude the following. Amy had been sexually abused by her grandfather, who she loved. This caused her to become confused and to make a false allegation against Stroik. The information from the CPS report would have provided a basis for the jury to find that Amy had made a similar allegation, also false, about a different male relative after allegedly being assaulted by her grandfather. Had counsel sought an in camera review of the CPS report, it would have been provided to him as it was to appellate counsel, and counsel should have immediately appreciated its probative value.

¶63   As such, we conclude that trial counsel did not provide a reasonable strategic reason not to seek and introduce evidence of Amy's allegedly false statement regarding her cousin. Accordingly, we conclude that, although counsel's overall strategy was reasonable, his implementation of it was not, and that counsel's omissions constituted deficient performance.

## B. Prejudice

¶64   Although Stroik has persuaded us that his trial counsel's performance was deficient, this alone does not entitle him to relief. *Strickland*, 466 U.S. at 687. Stroik must also "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is "a probability sufficient to

---

defense as he did—on allegations involving prior abuse by the child's grandfather and not her cousin"—was constitutionally deficient "in any way."

undermine confidence in the outcome." *Id.* For reasons we now explain, we conclude that there is a reasonable probability that, but for counsel's error, the jury would not have found Stroik guilty of sexual assault.

¶65 The circuit court concluded that the outcome of Stroik's trial was "far from certain," and the record bears this out. Although the State asserts that the evidence against Stroik was "overwhelming," we do not agree with the State's assessment. Our review of the record suggests that the jury could have easily found that the State failed to meet its burden to prove the allegations beyond a reasonable doubt. There was no physical evidence or witnesses to the alleged assault, and Stroik consistently denied the allegations. Amy was quite young when the alleged assault occurred, and there was evidence that she may have reported the assault after having been asked leading questions by family members embroiled in a family dispute following a contentious divorce. By the time of the trial, Amy was unable or unwilling to testify to having a memory of the assault. Under the circumstances, the verdict would necessarily depend on whom the jury found to be most credible—Amy, when she gave her account to the forensic investigator shortly after the assault, or Stroik, who consistently denied Amy's report.

¶66 The most compelling evidence of guilt came from the video of Amy's forensic interview, in which she consistently stated that Stroik took off her pants and put his hand on her "meme," she told him to stop, and he said, "No I am not going to stop." The credibility of this account was bolstered by several witnesses, who indicated that Amy was a "truthful" kid. Amy's mother, Laura, testified that she was "generally truthful," and Amy's father testified that Amy was "very" truthful. According to the police officer who interviewed Stroik, he said that Amy was "very truthful, and [Stroik] pretty much believes everything

31

that [Amy] says." The officer indicated that Stroik "never really changed his tune" of the topic of Amy's truthfulness, even after he knew that Amy had made allegations against him. During trial, Stroik himself acknowledged that he thought Amy was generally truthful, even though she had not been truthful about the report she made about him.

¶67 However, as a result of counsel's deficient performance, the jury did not hear evidence that could have chipped away at these uniform accounts of Amy's truthfulness by showing that, on at least one prior occasion, she may have made an untruthful report of sexual assault that was strikingly similar to the report she made about Stroik. This evidence could have been particularly significant in the face of the otherwise unanimous testimony that Amy was consistently truthful, when the verdict in this case turned exclusively on credibility.[26]

¶68 We now address two arguments to the contrary posed by the State. First, the State argues that the CPS report evidence would not have much mattered because there was an alternative inference that the jury could have made based on the evidence—that Amy's initial report about her cousin was true, but that she later said it was not true "due to familial pressure." We agree that this is one conceivable inference that the jury could draw from the evidence. But even if the

---

[26] For the sake of completeness, we mention an additional piece of evidence that the prosecutor featured during his closing argument. The prosecutor pointed to a statement that Stroik made as he was being arrested, which the arresting officer believed to be incriminating. Specifically, the officer testified that, as he was about to put Stroik in handcuffs, Stroik asked, "What if I did do it? What if I did touch her and all of that?" The officer testified that he took this statement to be an admission of guilt, but Stroik testified that he asked this question because he was handcuffed and scared and did not know what the consequences of the arrest could or would be. On appeal, the State does not argue that this statement, or for that matter any other statement by Stroik, is part of what it characterizes as the "overwhelming" evidence of guilt.

jury viewed the evidence that way, the evidence still could have undermined the otherwise unanimous accounts about Amy's truthfulness and could have led the jury to conclude that Amy was capable of making a false statement about the incident with the cousin when encouraged to do so by her father. It is difficult to see how an inference that Amy had made a false statement due to familial pressure could have hurt Stroik's defense.

¶69 Second, the State argues that introducing facts suggesting that Amy may have endured yet another sexual assault would have increased the jury's sympathy for her. Perhaps so. Yet, we assume that the jury would do as it was instructed to do—consider the evidence, and not be swayed by sympathy, prejudice, or passion. The State's argument does not undermine our conclusion that the introduction of evidence of Amy's prior allegation could have caused the jury to question the credibility of the statements Amy made during her forensic interview.

¶70 To prevail, Stroik need not prove that the outcome definitively would have been different—just that there is a reasonable probability of a different result but for counsel's error. *See State v. Smith*, 207 Wis. 2d 258, 275, 558 N.W.2d 379 (1997). Under the circumstances, we conclude that he has met his burden. Had jurors heard the additional evidence that Amy made a prior allegation that she later denied, there is a reasonable probability that the jury would have been unable to conclude beyond a reasonable doubt that Stroik was guilty of sexual assault.

## CONCLUSION

¶71 For the reasons discussed above, we conclude that the defendant is entitled to a new trial. We reverse the circuit court's judgment of conviction and

order, and we remand to the circuit court for further proceedings consistent with this opinion.

*By the Court.*—Judgment and order reversed and cause remanded.