STATE of Wisconsin, Plaintiff-Respondent,

v.

Robert Lavern CAMERON, Defendant-Appellant.†

Court of Appeals

*No. 2015AP1088–CR. Submitted on briefs March 1, 2016.*
*—Decided June 7, 2016.*

2016 WI App 54

(Also reported in 885 N.W.2d 611.)

† Petition For Review Filed.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Matthew S. Pinix* of *Law office of Matthew S. Pinix, LLC*, Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Brad D. Schimel*, attorney general, and *Jeffrey J. Kasel*, assistant attorney general.

Before Curley, P.J., Kessler and Brash, JJ.

¶ 1. KESSLER, J. Robert Lavern Cameron appeals a judgment of conviction, following a jury trial, of armed robbery, first-degree intentional homicide, attempted first-degree intentional homicide, bail jumping, and possession of a firearm by a felon. Cameron also appeals the order denying his postconviction motion for a new trial. On appeal, Cameron argues that: (1) the trial court erred when it failed to hold a *Daubert*[1] hearing, *sua sponte,* before allowing an intelligence analyst to give expert testimony about cell phone mapping; (2) the State's closing argument constituted plain error because "the prosecutor vouched for the credibility of a key state's witness"; (3) trial counsel was ineffective; and (4) the real controversy was not fully tried. (Capitalization omitted.) We affirm.

## BACKGROUND

¶ 2. On June 19, 2012, an Information charged Cameron with: (1) armed robbery; (2) attempted

[1] *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

first-degree intentional homicide, with the use of a dangerous weapon; (3) first-degree intentional homicide, with the use of a dangerous weapon; (4) bail jumping; and (5) felon in possession of a firearm. The charges stemmed from the shooting death of Russell Setum and shots taken at L.S., Setum's mother.

¶ 3. According to the facts adduced at trial, in the early morning hours of April 29, 2012, Setum met a female acquaintance at a Milwaukee gas station. When the acquaintance arrived at the gas station, she saw Setum speaking to a man who introduced himself as "Rico." "Rico" was later identified as Nicholas Smith. Setum and his acquaintance made plans to go to L.S.'s home. Setum and his acquaintance drove to L.S.'s home in separate cars.

¶ 4. Setum called his mother while in route to her house and informed her that he was nearby. Setum's mother went outside to wait for him. When Setum parked outside of his mother's home, a man with a gun approached Setum and ordered Setum to take off his coat, shoes, and jeans. Setum complied. Setum's mother, who witnessed the robbery, begged the robber not to hurt her son; however, the robber shot Setum twice in the head and proceeded to shoot at L.S. The shooter hit L.S. twice in the foot, ultimately resulting in the amputation of that foot.

¶ 5. Setum's mother was unable to identify the shooter; however, a police investigation led to charges against Smith. Smith made inculpatory statements to police and also implicated Cameron in Setum's robbery and the shootings. Smith told police that he and Cameron saw Setum at a club and made plans to rob Setum. Smith and Cameron followed Setum to a gas station, and then to Setum's home, where Smith said he witnessed Cameron shoot Setum in the head and

then shoot at Setum's mother multiple times. Smith agreed to testify against Cameron at trial, pursuant to a plea agreement.

¶ 6. At trial, the State also called Angela Rodriguez, an intelligence analyst at the Milwaukee High Intensity Drug Trafficking Area. On its witness list, the State named Rodriguez as an "Expert Witness as to Phone Tracking and Cell Phone Tower Data." (Bolding omitted.) Rodriguez explained the process of cell phone location mapping as it pertained to activity from Cameron's cell phone and the phones of other relevant parties. Rodriguez also testified as to the timings of various calls from the relevant actors, including Cameron. The parties stipulated to the authenticity of the records, as the records were obtained from the relevant cell phone service providers. No objection was made to Rodriguez's status as an expert witness.

¶ 7. At the close of testimony, the State summarized the evidence against Cameron and made the following statement regarding Smith's testimony:

> Ladies and Gentlemen, Nick Smith came in and he told you the truth. And it's true when he first was presented with an offer, a proffer agreement with no deals on the table he had to come in and tell us the truth. He didn't say at first. He didn't. He said he wasn't involved. He had to admit to his own involvement and eventually he did.
>
> And yes, a deal has been made and you have been told about every aspect of that deal. But the problem is, Ladies and Gentlemen, when you have a case like this and people like Robert Cameron and Nick Smith in a case like this, the phone evidence while it is corroboration and can tell you if someone is telling you the truth like it does with Nick Smith, you need a

witness. And Ladies and Gentlemen, Nick Smith, yes he was given a deal but he told you the truth.

Trial counsel did not object.

¶ 8. The jury found Cameron guilty as charged. Cameron filed a postconviction motion, arguing that he was entitled to a new trial because: (1) the trial court "failed in its gatekeeping role when it allowed Rodriguez to testify as an expert without first requiring proof that her testimony reflected scientific knowledge"; (2) the State's closing argument amounted to plain error; and (3) counsel was ineffective for failing to make a *Daubert* challenge to Rodriguez's testimony and for failing to object to the part of the State's closing argument in which the State "vouched for the credibility of [its] key witness." (Capitalization omitted.)

¶ 9. The postconviction court denied the motion. This appeal follows.

## DISCUSSION

¶ 10. On appeal, Cameron reiterates the arguments made in his postconviction motion and also contends that the real controversy of his case has not been fully tried.[2]

---

[2] Cameron contends, as a "threshold matter," that the postconviction court erroneously exercised its discretion when it adopted the State's response to his postconviction motion as its decision. The postconviction court adopted the State's response in toto. While we generally encourage courts to exercise independent rationales for their decisions, here, the State's brief properly set forth the facts at issue, the legal issues, and an analysis of those issues. Accordingly, the postconviction court did not erroneously exercise its discretion in adopting the State's response as its decision.

**Standard of Review.**

■

¶ 11. Because Cameron did not object either to Rodriguez's testimony or to the State's closing statement, Cameron must rely on the doctrine of plain error, which allows appellate courts to review errors waived by a party's failure to timely object. This doctrine is recognized in Wis. Stat. § 901.03(4) (2013–14).[3] The statute provides: "Nothing in this rule precludes taking notice of plain errors affecting substantial rights although they were not brought to the attention of the judge." *Id.* Our supreme court explained the doctrine of plain error in *State v. Jorgensen*, 2008 WI 60, 310 Wis. 2d 138, 754 N.W.2d 77:

> Plain error is error so fundamental that a new trial or other relief must be granted even though the action was not objected to at the time. The error, however, must be obvious and substantial. Courts should use the plain error doctrine sparingly. For example, where a basic constitutional right has not been extended to the accused, the plain error doctrine should be utilized. Wisconsin courts have consistently used this constitutional error standard in determining whether to invoke the plain error rule.
>
> However, the existence of plain error will turn on the facts of the particular case. The quantum of evidence properly admitted and the seriousness of the error involved are particularly important. Erroneously admitted evidence may tip the scales in favor of reversal in a close case, even though the same evidence would be harmless in the context of a case demonstrating overwhelming evidence of guilt.

[3] All references to the Wisconsin Statutes are to the 2013–14 version unless otherwise noted.

*Id.*, ¶¶ 21–22 (quoted sources, internal citations, and multiple sets of quotation marks omitted). Thus, for Cameron to prevail on his claims involving the lack of a *Daubert* determination and the State's closing argument, we must find that each constituted a plain error.

## The Trial Court was not Required to Conduct a *Sua Sponte Daubert* Hearing.

██

¶ 12. Cameron argues that the trial court failed in its function as a "gatekeeper" when it allowed Rodriguez to testify as an expert, despite Cameron's lack of an objection. In essence, Cameron contends that the trial court should have held a *sua sponte Daubert* hearing. Both federal and state courts have held that the "[f]ailure to raise a *Daubert* challenge at trial causes a party to waive the right to raise objections to the substance of expert testimony post-trial." *See Skydive Arizona, Inc. v. Quattrocchi*, 673 F.3d 1105, 1113 (9th Cir. 2012); *Marbled Murrelet v. Babbitt*, 83 F.3d 1060, 1066 (9th Cir. 1996) ("the appropriate time to raise *Daubert* challenges is at trial. By failing to object to evidence at trial and request a ruling on such an objection, a party waives the right to raise admissibility issues on appeal."); *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 409 (Tex. 1998) ("To preserve a complaint that scientific evidence is unreliable and thus, no evidence, a party must object to the evidence before trial or when the evidence is offered.").

¶ 13. Cameron's argument fails for multiple reasons. First, courts have expressly rejected Cameron's claim that the trial court's obligation to act as a

gatekeeper under *Daubert* requires it to conduct a *Daubert* admissibility analysis even if there is no objection to the testimony:

> It is without question that Rule 702 of the Federal Rules of Evidence imposes an obligation on trial courts to ensure that all expert testimony is reliable. The trial court, in performing its "gatekeeping" function, has discretion to choose the manner in which the reliability of an expert's testimony is appraised. However, the trial court has no discretion to abandon its role as gatekeeper. When a party objects to an expert's testimony, the court must adequately demonstrate by specific findings on the record that it has performed its duty . . . . *Absent an objection, the trial judge is not required to announce for the record that the expert witness's testimony is based on reliable methodology. A defendant must still make a timely objection to preserve error for appeal* . . . . If the defendant fails to object to the expert's testimony, then the defendant waives appellate review absent plain error.

*United States v. Bates*, No. 99–11382, unpublished slip op. at 3 (5th Cir. Nov. 21, 2000) (first ellipses and first set of quotation marks in *Bates*; emphasis added; quoted sources, internal citations, and multiple sets of quotation marks omitted); *see also McKnight v. Johnson Controls, Inc.*, 36 F.3d 1396, 1407 (8th Cir. 1994) ("To the extent that JCI is arguing that the district court was required to exercise its gatekeeping authority over expert testimony without an objection, we disagree.").

¶ 14. Second, Cameron's argument that the trial court should have made an unrequested *Daubert* determination is premised on the assertion that Rodriguez's testimony would have been excluded as failing to qualify as expert testimony under Wis. Stat.

§ 907.02(1).[4] Cameron ignores the fact that Rodriguez's testimony primarily centered on stipulated phone records obtained from cell service providers. Cameron's trial counsel stipulated to the authenticity and use of the cell phone service provider records. Rodriguez explained what the information on the service provider documents meant in relation to the various cell phones material to this case. She explained how the provider records indicated the identified strength of the signal from the various specific towers, and how that related to the probable location of the specific cell phones. Using this service provider data, she explained how she prepared maps showing the location of the cell phones possessed by Cameron and his co-actors at various times on the night of the crimes. After stipulating to the authenticity of the service provider records, Cameron's trial counsel made no objection to any of the evidence or opinions based on those records.

¶ 15. Moreover, although the State's witness list disclosed Rodriguez as an expert witness, we have previously held that "a witness need not be an expert to take the information provided by a cell phone provider and transfer that information onto a map." *See State v. Butler*, case No. 2014AP1769, unpublished slip op. ¶ 17 (WI App June 9, 2015). We remain of that view.

---

[4] WISCONSIN STAT. § 907.02(1) provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if the testimony is based upon sufficient facts or data, the testimony is the product of reliable principles and methods, and the witness has applied the principles and methods reliably to the facts of the case.

¶ 16. We conclude that in the absence of something which is immediately clearly of constitutional dimension, which our supreme court has used to define "plain error," a trial judge is not expected to raise an evidentiary issue mid-trial on his or her own initiative. We conclude that the trial court's failure to *sua sponte* engage in a *Daubert* analysis of Rodriguez's cell phone mapping testimony was not plain error.

## The State's Closing Argument was not Plain Error.

¶ 17. Cameron also contends that he is entitled to a new trial because the State impermissibly vouched for the credibility of a key witness—Smith—when the State told the jury that Smith "told you the truth." Because Cameron neither objected to the prosecutor's comments nor moved for a mistrial, he forfeited these challenges. *See State v. Saunders*, 2011 WI App 156, ¶ 29 n.5, 338 Wis. 2d 160, 807 N.W.2d 679. He argues that he is nonetheless entitled to a new trial because the prosecutor's comments amounted to plain error. We disagree.

¶ 18. When a defendant alleges that a prosecutor's statements constituted plain error, the test we apply is whether, in the context of the entire record of the trial, the statements " 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " *See State v. Davidson*, 2000 WI 91, ¶ 88, 236 Wis. 2d 537, 613 N.W.2d 606 (citation and one set of quotation marks omitted).

¶ 19. During closing arguments, a prosecutor is entitled to "comment on the evidence, detail the evidence, argue from it to a conclusion, and state that the evidence convinces him or her and should convince the jurors." *See State v. Adams*, 221 Wis. 2d 1, 19, 584 N.W.2d 695 (Ct. App. 1998). Further, "a prosecutor is permitted to comment on the credibility of witnesses as long as that comment is based on evidence presented." *Id.* at 17. That is what the prosecutor did here.

¶ 20. The State presented the testimony of a co-actor, Nicholas Smith, who detailed the crime for the jury, including a description of Cameron's involvement. Smith admitted to one criminal conviction, to having been charged in this case, and to having accepted an offer to tell the District Attorney what had occurred without a promise of any specific benefit. In exchange for his truthful testimony, Smith ultimately received a reduced charge and a promise from the State to recommend prison time, but not to recommend a specific length of incarceration, all of which was disclosed to the jury. *See United States v. Machi*, 811 F.2d 991, 1003 (7th Cir. 1987) ("[T]here is nothing improper in bringing to the jury's attention the fact that the government has an agreement with one of its witnesses that requires a witness to testify truthfully."). The State used this evidence to: (1) show Cameron's presence in the area of the robbery and murder; (2) show that Cameron knew who the victim was and "want[ed] to get him"; and (3) corroborate some of the evidence from the cell phone mapping.

¶ 21. In his closing argument, the prosecutor reviewed the evidence for the jury. He discussed Smith's testimony, the cell phone records that showed when calls were made between the various actors in

relation to the events Smith described, security videos that showed Smith and others at a gas station shortly before the robbery, security videos that showed the movement of the vehicles after the robbery, and the cell phone location evidence that confirmed Smith's account of where various people were that night. In summarizing Smith's testimony, the prosecutor told the jury:

> *Ladies and Gentlemen, Nick Smith came in and he told you the truth.* And it's true when he first was presented with an offer, a proffer agreement with no deals on the table he had to come in and tell us the truth. He didn't say at first. He didn't. He said he wasn't involved. He had to admit to his own involvement and eventually he did.
>
> *And yes, a deal has been made and you have been told about every aspect of that deal. But the problem is, Ladies and Gentlemen, when you have a case like this and people like Robert Cameron and . . . Nick Smith in a case like this, the phone evidence while it is corroboration and can tell you if someone is telling you the truth like it does with Nick Smith, you need a witness. And Ladies and Gentlemen, Nick Smith, yes he was given a deal but he told you the truth.*

(Emphasis added.)

¶ 22. Here, in the context of the entire closing argument, the prosecutor argued that the jury should conclude that Smith told the truth based on: (1) the evidence from the cell phones corroborating who was where and when during the crimes; (2) videos confirming various participants' presence at a gas station shortly prior to the crimes; (3) Smith's admission of his own involvement; and (4) the plea agreement with Smith which required that Smith tell the truth at trial. We are not persuaded that the prosecutor's remarks

were so egregious as to constitute plain error or usurp the role of the jury as arbiter of witness credibility. *See Davidson*, 236 Wis. 2d 537, ¶ 88. The comments were limited in scope, were a direct commentary on the evidence, and were an exercise of the prosecution reasoning from the evidence to a conclusion. *See id.*

**Counsel did not Render Ineffective Assistance.**

¶ 24. Cameron contends that his trial counsel was ineffective for failing to challenge Rodriguez's testimony, either by making a *Daubert* challenge or by presenting a defense expert. He also argues that trial counsel was ineffective for failing to object to the part of the State's closing statement in which the State told the jury that Smith's testimony was truthful.

¶ 25. The standard required to establish ineffective assistance is well- known:

> To prevail on an ineffective assistance of counsel claim, the defendant must show that counsel's actions or inaction constituted deficient performance and that the deficiency caused him prejudice. To prove constitutional deficiency, the defendant must establish that counsel's conduct falls below an objective standard of reasonableness. To prove constitutional prejudice, the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. The focus of the inquiry is not on the outcome of the trial, but on the reliability of the proceedings.

*State v. Love*, 2005 WI 116, ¶ 30, 284 Wis. 2d 111, 700

N.W.2d 62 (quoted sources, internal citations, and multiple sets of quotation marks omitted).

¶ 26. Trial counsel did not provide ineffective assistance by failing to object to Rodriguez's testimony regarding cell phone mapping. This was not deficient performance because basic cell phone signal technology has already been held by this court to be admissible evidence. Challenges to this type of cell phone location technology have been rejected by other courts. *See e.g., Jackson v. Allstate Ins. Co.*, 785 F.3d 1193, 1204 n.5 (8th Cir. 2015); *United States v. Gatson*, No. 2:13–CR–705, 2015 U.S. Dist. WL 5920931, at *2 (D.N.J. Oct. 9, 2015); *United States v. Henderson*, No. CR10–117 BDB, 2011 U.S. Dist. WL 6016477, at *5 (N.D. Okla. Dec. 2, 2011). In some cases, the reliability of cell phone mapping was found to be so well-established that a *Daubert* hearing was not necessary. *See United States v. Jones*, 918 F. Supp. 2d 1, 6–7 (D.C. 2013).

¶ 27. Rodriguez readily acknowledged the limitations of the cell phone tracking and mapping process by stating that cell towers generally provide signals within a certain range, but do not provide the specific location of phone calls within the general range. A statement from Cameron's postconviction expert, Daniel van der Weide, an electrical and computer engineering professor, does not necessarily contradict Rodriguez's testimony. Rather, van der Weide acknowledged additional limitations to cell phone technology, stating "[i]n the absence of . . . a sophisticated analysis, it is difficult to state with certainty that a given device was in a given sector." The observations of both Rodriguez and van der Weide go to the weight of the evidence of cell phone location mapping—not the admissibility. Based on the record before us, we cannot conclude that

there would have been a reasonable probability of a different outcome had trial counsel either objected to the admissibility of Rodriguez's testimony or retained a defense expert.

¶ 28. We also conclude that trial counsel was not ineffective for failing to object to the State's closing statement pertaining to the truth of Smith's testimony. Because the prosecutor's remarks were not improper, an objection would not have been sustained. It is not deficient performance for counsel not to make a pointless objection. *See State v. Toliver*, 187 Wis. 2d 346, 360, 523 N.W.2d 113 (Ct. App. 1994) (counsel not ineffective for failing to pursue futile arguments).

**The Real Controversy has been fully tried.**

¶ 29. Finally, Cameron contends that "the Rodriguez evidence resulted in the real controversy not being fully tried." (Capitalization omitted.)

¶ 30. Wisconsin Stat. § 752.35 grants us the authority to grant a new trial under our discretionary power of reversal. The statute provides:

> In an appeal to the court of appeals, if it appears from the record that the real controversy has not been fully tried, . . . the court may reverse the judgment or order appealed from, . . . and may direct . . . a new trial . . . to accomplish the ends of justice.

¶ 31. The statute has been interpreted to provide very limited authority to order a new trial "where the real controversy has not been fully tried." *See id.* In *State v. Hicks*, 202 Wis. 2d 150, 159–160, 549 N.W.2d 435 (1996), our supreme court explained:

> [A] new trial may be ordered in either of two ways: (1) whenever the real controversy has not been fully tried; or (2) whenever it is probable that justice has for any reason miscarried. Separate criteria exists for determining each of these two distinct situations.
>
> This court may exercise its power of discretionary reversal under the first part of Wis. Stat. § 751.06, without finding the probability of a different result on retrial when it concludes that the real controversy has not been fully tried .... [S]ituations in which the controversy may not have been fully tried have arisen in two factually distinct ways: (1) when the jury was erroneously not given the opportunity to hear important testimony that bore on an important issue of the case; and (2) when the jury had before it evidence not properly admitted which so clouded a crucial issue that it may be fairly said that the real controversy was not fully tried.

¶ 32. Such discretionary reversal power is exercised only in "exceptional cases." *Hicks*, 202 Wis. 2d at 161. The power to grant a new trial in the interest of justice is to be exercised " 'infrequently and judiciously.' " *State v. Avery*, 2013 WI 13, ¶ 38, 345 Wis. 2d 407, 826 N.W.2d 60 (citation omitted). We conclude that Cameron has not demonstrated this is an exceptional case requiring our discretionary grant of a new trial because we are satisfied that the real controversy has been fully tried.

¶ 33. Here, Cameron's claim for a new trial in the interest of justice is based on his contention that Rodriguez's testimony was inadmissible and "crucial to the State's case against him." Cameron's argument merely reiterates the arguments we have already discussed. We have already determined that the cell phone mapping testimony was admissible and that the

results of the proceeding would likely not have been different absent Rodriguez's testimony. Accordingly, Cameron is not entitled to a new trial in the interest of justice.

## CONCLUSION

¶ 34. For all the reasons we have explained, we conclude that: (1) in the absence of plain error of obvious constitutional dimension, a trial court is not required to conduct a *Daubert* inquiry in the absence of an objection by counsel to the proposed evidence; (2) the prosecutor's remarks in the context of the entire closing argument and the evidence in this case were neither prosecutorial misconduct nor plain error; (3) there was no ineffective assistance of counsel in failing to object to either the cell phone tracking testimony or the prosecutor's closing argument because neither constituted plain error; and (4) this is not an exceptional case requiring our discretionary grant of a new trial.

*By the Court.*—Judgment and order affirmed.