COURT OF APPEALS
DECISION
DATED AND FILED

January 18, 2023

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

**This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.**

**A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals.** *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No. 2022AP273-CR**

Cir. Ct. No. 2017CF5716

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT I

---

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

MARQUISE LAMONT BROWN,

DEFENDANT-APPELLANT.

---

APPEAL from a judgment and an order of the circuit court for Milwaukee County: STEPHANIE ROTHSTEIN, Judge. *Affirmed*.

Before Brash, C.J., Donald, P.J., and Dugan, J.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Marquise Lamont Brown appeals his judgment of conviction for second-degree reckless homicide with the use of a dangerous

weapon, as a party to a crime, and for being a felon in possession of a firearm. He also appeals the order denying his postconviction motion, in which he claimed his trial counsel was ineffective for failing to object to the testimony of three witnesses, which he asserted included inadmissible hearsay. Upon review, we affirm.

## BACKGROUND

¶2      The charges against Brown stem from a shooting that occurred in September 2015. According to the criminal complaint, at approximately 2:00 a.m. on September 17, 2015, shortly after a Shot Spotter alert indicated gunfire in the area of North 12th Street in Milwaukee, Alvin Brown[1] was brought to the District 5 Station of the Milwaukee Police Department (MPD) on North 4th Street; he was sitting in the front passenger seat of a blue Buick Rendezvous, and had been shot. Lifesaving measures were performed on Alvin, but he died at the scene. An examination of the Rendezvous indicated that Alvin had been seated in the passenger seat of the vehicle when he was shot.

¶3      Meanwhile, officers investigating the Shot Spotter alert on North 12th Street recovered two spent brass shell casings from a 9mm semiautomatic firearm. They also found a silver and black pistol magazine for a 9mm gun, loaded with live rounds.

¶4      Later that day, security officers at a Fleet Farm in Germantown stopped Letreya Powell and Darren Washington because Washington had stolen some ammunition. Brown was with them and was waiting in the car, but upon

---

[1] The State noted that there is no familial relationship between the defendant and the victim, although they have the same last name. For ease of reading, we refer to the victim by his first name.

seeing that Powell and Washington had been stopped, he got out of the car and ran; he was caught and taken into custody.

¶5      Officers from the MPD subsequently interviewed Powell several times.  She stated that she had been "riding around" with Brown in her brown Volkswagen Jetta during the early morning hours of September 17, 2015.  She said they were stopped on North 12th Street when a blue Buick Rendezvous, which had been driving toward them, "blocked them in."

¶6      Powell stated that there was another passenger in the Jetta—a man who was unknown to her.  When the Rendezvous stopped next to their vehicle, the unknown man announced that someone in the Rendezvous was "holding something out the window."  Powell said she then saw Brown pull something from "somewhere on his right side"; he then fired two shots at the Rendezvous from a black handgun.

¶7      Powell explained to police that she had then picked up Brown later that day, at about 1:00 p.m.  Powell heard Brown talking on the phone, saying that he had to "get rid of his gun" after a "situation the other night," and that "all it needs is a new magazine."  Powell said they then picked up Washington to go with them to buy the magazine because he "had an ID."

¶8      Powell said that when they arrived at the Germantown Fleet Farm, they all went into the store.  They picked out a 9mm magazine and "some 9mm ammo" which Powell purchased, since it turned out that Washington did not have his identification with him.

¶9      Powell stated that Brown left the store while she was making the purchase.  After she and Washington were subsequently stopped by security on their

3

way out and Brown ran from the vehicle, she was "let go" because she had the receipt for the items she had purchased. She then returned to her car and discovered a black handgun and a bag of drugs had been stuffed between the front passenger seat and the center console. She assumed Brown had put them there because they were not there when she had gotten out of the car. Powell told police she threw the gun and the drugs underneath the vehicle parked next to her.

¶10    Officers from the Germantown Police Department recovered the gun from the parking lot at Fleet Farm. A DNA swab was taken from the gun and analyzed; it indicated that Brown was the "major contributor" of the DNA profile that was found on the gun. Additionally, it was determined that the shell casings recovered from the shooting scene on North 12th Street, as well as a bullet that was recovered from Alvin's body during the autopsy, all came from that gun.

¶11    Brown was ultimately charged with first-degree reckless homicide with the use of a dangerous weapon, as a party to a crime, and with possession of a firearm by a felon in December 2017. The matter proceeded to a jury trial in January 2020.

¶12    At the trial, Powell was called as a witness for the State. She testified that she was looking down at her phone and did not see the shooting, but rather only heard gunshots. She stated that she did not see Brown pull a gun out from his right side, and did not recall telling detectives that she had seen him shoot at the Rendezvous when she was being interviewed. When asked about the differences in her testimony as compared to her statements to police that Brown was the shooter, Powell said that she was "scared" at the time of the interviews, and had not told the detectives the truth.

¶13    The State subsequently called two of the detectives who had interviewed Powell in October 2015, and a portion of her interviews were played for the jury.  Those interviews, along with the corresponding testimony from the detectives, demonstrated that Powell had changed her story as to who had shot at the Rendezvous: she had first stated that it was the unidentified man in the Jetta with them at the time of the shooting; then she said that she did not see who fired the shots; and finally, she stated that she had seen Brown with a gun and he was the shooter.

¶14    Another witness for the State was Destyn Montaque.  Montaque confirmed that he knew both Brown and Powell.  Montaque's testimony regarding the shooting involved statements that he asserted Powell made to him in February or March of 2017.  Specifically, Montaque testified that Powell had told him she had been "in a car" with Brown in 2015 and he ended up "shootin' a guy," and that Brown had "lost the clips" for the gun so they went to a gun store that was "far out" to "get some bullets and clips[.]"  He further stated that Powell had told him about being stopped by security officers at the store, and that Brown had fled during that incident.  Montaque said that Powell also told him about finding the gun and drugs in her car after that incident and throwing them out of the car, and that they were subsequently found by the police.

¶15    Other evidence presented by the State included a witness who testified that the gun recovered in the Fleet Farm parking lot was the same gun he had previously sold to Brown, and telephone calls Brown made from jail to his mother, in which he stated that he hoped Powell would not talk to police or testify against him.

¶16    The jury convicted Brown of second-degree reckless homicide with the use of a dangerous weapon, as a party to a crime—a lesser-included offense. The jury also found him guilty of being a felon in possession of a firearm. Brown was sentenced to a total of seven years of initial confinement and five years of extended supervision.

¶17    Brown filed a postconviction motion seeking a new trial, claiming that his trial counsel was ineffective for failing to object to inadmissible hearsay testimony by three of the State's witnesses: the two detectives who testified after Powell and presented her prior statements to police regarding the shooting; and Montaque's testimony, which Brown asserts did not meet the requirements for admissibility as extrinsic evidence of a prior inconsistent statement pursuant to WIS. STAT. § 906.13(2) (2019-20).[2]

¶18    The trial court rejected Brown's claim regarding the testimony of the two detectives, finding that their testimony met the requirements for being admissible as prior inconsistent statements by Powell, pursuant to WIS. STAT. § 908.01(4)(a)1. However, the court concluded that a *Machner*[3] hearing was necessary to determine whether there was a strategic reason behind trial counsel's failure to object to Montaque's testimony.

¶19    At the end of the *Machner* hearing, the trial court found that while Brown's trial counsel was deficient for failing to object to Montaque's testimony, that testimony related to just a "small part" of Powell's testimony, and was not

---

[2] All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

[3] *See State v. Machner*, 92 Wis. 2d 797, 804, 285 N.W.2d 905 (Ct. App. 1979) (a claim of ineffective assistance of counsel requires that a postconviction evidentiary hearing be held "to preserve the testimony of trial counsel").

"determinative of the outcome" of the trial. Therefore, that deficiency did not undermine the court's confidence in the outcome and, as a result, it found that Brown's ineffective assistance claim failed. This appeal follows.

## DISCUSSION

¶20    On appeal, Brown asserts that the trial court erred in rejecting both of his ineffective assistance of counsel claims. We review ineffective assistance claims using the familiar two-prong test: a defendant must show that his trial counsel's performance was deficient and that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The defendant "must prevail on both parts of the test to be afforded relief." *State v. Allen*, 2004 WI 106, ¶26, 274 Wis. 2d 568, 682 N.W.2d 433. We review *de novo* "'the legal questions of whether deficient performance has been established and whether it led to prejudice rising to a level undermining the reliability of the proceeding.'" *State v. Roberson*, 2006 WI 80, ¶24, 292 Wis. 2d 280, 717 N.W.2d 111 (citation omitted). However, "[a] court need not address both components of this inquiry if the defendant does not make a sufficient showing on one." *State v. Smith*, 2003 WI App 234, ¶15, 268 Wis. 2d 138, 671 N.W.2d 854.

*Testimony of Detectives*

¶21    As noted above, the trial court rejected Brown's claim of ineffective assistance of counsel relating to the testimony of the detectives who testified after Powell regarding her inconsistent statements during her testimony, without granting a *Machner* hearing. A defendant, however, is not automatically entitled to a *Machner* hearing on his or her postconviction motion. *State v. Bentley*, 201 Wis. 2d 303, 309-10, 548 N.W.2d 50 (1996). For example, a hearing "is not mandatory … if the record as a whole conclusively demonstrates that the defendant is not entitled

7

to relief." ***State v. Ruffin***, 2022 WI 34, ¶38, 401 Wis. 2d 619, 974 N.W.2d 432. In that case, the trial court, in its discretion, may either grant or deny a hearing. ***Id.***, ¶35.

¶22　For this claim, the trial court determined that the record conclusively showed that Brown was not entitled to relief as a matter of law. *See **id.***, ¶38. Specifically, the court found that the detectives' testimony was admissible for purposes of showing that Powell had made inconsistent statements during her testimony when compared to her statements in previous interviews with the detectives, pursuant to WIS. STAT. § 908.01(4)(a)1. Under that statute, "prior statements by a witness are not hearsay if '[t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is ... [i]nconsistent with the declarant's testimony.'" ***State v. Prineas***, 2012 WI App 2, ¶18, 338 Wis. 2d 362, 809 N.W.2d 68 (citation omitted; alterations in ***Prineas***).

¶23　We agree. Powell testified that when she told the detectives during her last interview that she had seen Brown with a gun and that he was the shooter, it was "a complete lie" because she had not seen anything, but rather had only heard the shots. In this context, Powell's inconsistencies with her prior statements were exposed during the direct examination by the State, and Brown's trial counsel questioned her about the veracity of those statements during his cross-examination. Thus, the requirements of WIS. STAT. § 908.01(4)(a)1. were met, and therefore Powell's prior inconsistent statements presented by the detectives during their testimony were not hearsay. *See **Prineas***, 338 Wis. 2d 362, ¶18.

¶24　Nevertheless, Brown argues that because Powell's testimony included statements that she did not recall making certain statements to the detectives, her

prior statements to the detectives would be admissible only if the trial court had reason to doubt the good faith of her lack of recollection, citing *State v. Lenarchick*, 74 Wis. 2d 425, 247 N.W.2d 80 (1976). In *Lenarchick*, our supreme court held that when a witness denies recollection of a prior statement and the trial court "has reason to doubt the good faith of such denial," the court "may in [its] discretion declare such testimony inconsistent and permit the prior statement's admission into evidence." *Id.* at 436.

¶25 Here, the State argues that the circumstances of Powell's testimony do not compare to those in *Lenarchick* in that Powell stated unequivocally that her statements during her final interview with the detectives were "a complete lie." In contrast, the witness in *Lenarchick* testified that she simply had no recollection of any inculpatory statements the defendant had made to her, or of relaying those statements to police. *Id.* at 429.

¶26 We agree that *Lenarchick* is not applicable here. There would be no purpose in requiring an affirmative finding by the trial court that Powell's testimony was inconsistent with her prior statements to the detectives, when Powell herself categorized those statements as "a complete lie." Furthermore, the court in *Lenarchick* recognized that "[w]hether what a witness says on the stand is inconsistent with a prior statement lies within the discretion of the trial [court]." *Id.* at 435. We will uphold such a discretionary evidentiary determination as long as the trial court "examined the relevant facts, applied a proper legal standard, and reached a reasonable conclusion using a demonstrated rational process." *State v. Mayo*, 2007 WI 78, ¶31, 301 Wis. 2d 642, 734 N.W.2d 115. We conclude that the trial court did so here.

9

¶27 Therefore, because we conclude that the trial court properly admitted the testimony of the detectives as inconsistent statements relating to Powell's testimony, Brown's claim that his trial counsel was ineffective for failing to object to the detectives' testimony necessarily fails. *See* *State v. Cameron*, 2016 WI App 54, ¶27, 370 Wis. 2d 661, 885 N.W.2d 611 ("It is not deficient performance for counsel not to make a pointless objection."). Accordingly, the trial court did not err in rejecting Brown's claim without a hearing. *See* *Ruffin*, 401 Wis. 2d 619, ¶35.

*Testimony of Montaque*

¶28 We next turn to Brown's argument that the trial court erred in finding, after a *Machner* hearing, that although his trial counsel was deficient for failing to object to Montaque's testimony, Brown was not prejudiced by this error. Specifically, the court rejected Brown's assertion that Montaque's testimony was inadmissible extrinsic evidence because it did not meet the requirements of WIS. STAT. § 906.13(2). In particular, Brown points to the requirement that the witness who gave the inconsistent statement—Powell—has "not been excused from giving further testimony in the action." Sec. 906.13(2)(a)2. In this case, Powell—who testified prior to Montaque—was excused from her subpoena following her testimony.

¶29 At the *Machner* hearing on this issue, Brown's trial counsel acknowledged that he had "simply missed the issue." The trial court thus found that this was a deficiency on the part of trial counsel, but that no prejudice had resulted from that error. To demonstrate prejudice, the defendant must show that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. However, a defendant "cannot meet this burden by simply showing that an error had some conceivable effect on the

10

outcome." ***State v. Koller***, 2001 WI App 253, ¶9, 248 Wis. 2d 259, 635 N.W.2d 838. Rather, establishing prejudice "means showing that counsel's alleged errors actually had some adverse effect on the defense." ***Id.***

¶30 The trial court found that Brown had failed to demonstrate prejudice because Montaque's testimony had not affected the outcome of the trial. *See* ***Strickland***, 466 U.S. at 687. In making this finding, the court referenced "a wealth of other evidence," including "small pieces and larger pieces of circumstantial evidence," which "all came together" to support the resulting guilty verdicts. This evidence included the gun used in the shooting that was linked to Brown through his DNA; the witness who testified that he had sold the gun to Brown; Brown's arrest at Fleet Farm after Powell had purchased ammunition there for the gun; and Brown's telephone calls to his mother from jail in which he declared his hope that Powell would not talk to police.

¶31 We also conclude that trial counsel's error in failing to object to Montaque's testimony did not undermine our confidence in the outcome of the trial, due to the other evidence presented against Brown. *See* ***id.*** Therefore, Brown failed to demonstrate that he was prejudiced by his counsel's deficiency and, as a result, this ineffective assistance claim fails as well. *See* ***Allen***, 274 Wis. 2d 568, ¶26.

¶32 Accordingly, as both of Brown's claims of ineffective assistance of counsel fail, we affirm his judgment of conviction as well as the trial court's order denying his postconviction motion.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.