COURT OF APPEALS
DECISION
DATED AND FILED

January 10, 2024

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2022AP837-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2017CF1183

IN COURT OF APPEALS
DISTRICT II

STATE OF WISCONSIN,

 PLAINTIFF-RESPONDENT,

 V.

ROBERT L. EVANS,

 DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Waukesha County: MICHAEL P. MAXWELL and PAUL BUGENHAGEN JR., Judges. *Affirmed*.

Before Gundrum, P.J., Neubauer and Grogan, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Robert L. Evans appeals a judgment of conviction for first-degree sexual assault of a child (four-year-old Mary)[1] and an order denying his motion for postconviction relief.[2] He contends that as a result of his trial counsel's constitutionally ineffective assistance, the circuit court excluded key evidence—namely, unspecified marital and financial difficulties of Mary's parents—supporting his defense theory that Mary's mother, Amy, had "misinterpret[ed]" the events she witnessed, incorrectly assumed a sexual assault had taken place, and tainted Mary's memories with her misperceptions. Evans also argues he received constitutionally ineffective assistance related to his attorney's handling of the State's cross-examination of his expert witness on child memory. His final arguments are that he is entitled to a new trial in the interest of justice or, alternatively, that he is entitled to resentencing because inaccurate information was presented at his sentencing hearing.

¶2 We reject Evans's arguments. He has demonstrated neither deficient performance nor prejudice arising from his attorney's failure to more fully articulate the relevancy of the excluded evidence regarding Mary's parents' marital and financial difficulties. Evans also has not demonstrated prejudice arising from his attorney's failure to object to certain of the State's questions posed to his expert witness. We further conclude Evans is not entitled to a new trial in the interest of justice or resentencing. We therefore affirm.

---

[1] Consistent with the policy underlying WIS. STAT. RULE 809.86 (2021-22), we use pseudonyms to refer to the victim and her family members. All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

[2] The Honorable Michael P. Maxwell presided over the trial. The Honorable Paul Bugenhagen Jr. presided over the postconviction proceedings.

## BACKGROUND

¶3      Evans was longtime friends with Mike, who is Mary's father and Amy's husband. After Evans moved to Wisconsin from Texas in 2016, he stayed with the family for a short time. Amy testified at trial that his one-to-two week stay at that time was "complicated" because her father-in-law was recovering from a heart attack and staying with the family as well. At the family's request, Evans went to stay with his aunt in Wauwatosa, where he lived for approximately the next year.

¶4      Evans returned to live with Mike, Amy and Mary about one week prior to August 23, 2017, the date of the sexual assault. Amy testified that on that date, Mary was upstairs in Evans's room playing with her iPad, and Amy thought she should go play outside. Amy went to the guest bedroom and found Evans laying on the bed, positioned on his side under the covers. She did not see Mary at first. When Amy asked where Mary was, Evans threw off the covers and Amy saw Mary next to him, near his midsection, with her pants and underwear around her ankles. Amy asked Mary why her pants were off; Mary responded that she did not know. Evans then interjected, exhorting that Mary "better tell your mom what's going on because she's starting to think some things." Mary then said she had an itch.[3]

¶5      Amy further testified that she removed Mary from the room and suggested they go for a bike ride. While Mary was changing, Evans walked down

---

[3] Mary had an intermittent problem with itching in her groin area, and Amy had put ointment on it earlier that day. However, Mary stated at the forensic interview that Evans just wanted to touch her and his touching was unrelated to any itching.

the hallway like nothing happened and said, "[W]ell, that was awkward." Evans told Amy that Mary had pulled down her own pants. Following a confrontation with Mike, Evans was arrested.

¶6    Mike briefly talked with Mary about what had happened in the bedroom with Evans. He recorded video of portions of the discussion on his cell phone. Police also spoke briefly with Mary about the incident. During both conversations, Mary alleged that Evans had touched her inappropriately. After Mary made the allegations, police stopped the questioning, advised Mike and Amy not to ask Mary any further questions, and set up a forensic interview for the next day. Mary made similar allegations during that interview.

¶7    At trial, Mary testified that while they were in the bed Evans had touched her "[b]utt and noni"—the latter being Mary's word for vagina. Mary initially testified Evans had not touched her anywhere else, though she responded "[y]es" when asked specifically whether Evans had also touched her forehead—a claim she had also made during the earlier interviews. Evans's DNA was consistent with the DNA found on the interior of the underwear Mary was wearing.

¶8    Evans testified and denied that he had touched Mary inappropriately. Evans stated he "probably went to sleep" when Mary was watching movies in the room and he woke up to find Amy standing nearby asking for Mary with "kind of a frustrated look" or "scowl on her face." Evans testified he saw a lump in the bed and pulled back the covers to reveal Mary "fidgeting with her pants." Evans denied following Amy down the hallway, instead asserting that he immediately rolled over and went back to sleep.

¶9      Part of the defense strategy was to suggest that Amy misunderstood what she saw in the bedroom because she disliked Evans and was unhappy he was staying in their home. Evans testified that just prior to Amy finding Mary in his room, he and Amy had a heated argument in which Amy told him she had had enough and was fed up. Mike, too, was upset with Evans at the time; Evans had been working at a construction site with Mike in the early morning hours and had fallen asleep in a truck. Evans testified he planned to find a new residence the next day, as it was "very clear … that there were some things going on within the house, within our relationship, family and friends, that it was uncomfortable for me to be there."

¶10     When defense counsel attempted to explore the home dynamics during Mike's cross-examination, Mike denied that Evans had suggested he see a counselor for unspecified financial and marital problems. Counsel's follow-up question about whether Mike was having financial problems at the time was met with a relevancy objection. At a sidebar, defense counsel explained:

> I won't stray too far into the information I have, but I think it's relevant to provide context to the jury for some problems that were going on financially in the household – financial problems that impacted Mr. Evans[4] to provide context in the environment it was made.… I think [statements Evans made when Mike confronted him were] consistent in the sense of saying there were problems going on in the house at the time. I also feel we can't take the accusations out of context. The things don't exist in a vacuum.

---

[4] There was a suggestion that Evans had been working for Mike's contracting business without pay.

The circuit court determined questions about the parents' financial or marital difficulties were irrelevant given that the "central allegation" was coming from Mary.

¶11  Psychologist David Thompson offered expert testimony for the defense regarding child memory and forensic interview techniques. Thompson testified that although the forensic interviewer had not used suggestive questioning, she had deviated from best practices by asking significantly more "option choosing" questions (and fewer "invitation" questions) than would be expected under best practices. The poor interviewing techniques caused Thompson concern given the "possibility of misinformation being provided" to Mary, but Thompson stated the materials he was supplied did not contain evidence that external factors tainted Mary's recollection.

¶12  During Thompson's cross-examination, the prosecutor asked some questions about another case in which Thompson testified earlier in the year, a criminal prosecution against Robin Orth, a man accused of three counts of first-degree sexual assault of a child.[5] The objectives of the cross-examination appear to have been to emphasize Thompson's frequent defense-side work and to challenge Thompson's opinions for the same reasons they had been challenged in that litigation.

¶13  The prosecutor elicited testimony from Thompson that Orth had been convicted of some of the sexual assault counts against him. Evans argues on

---

[5] *See State v. Orth*, Waukesha County Circuit Court case No. 2016CF1443. We take judicial notice of CCAP records pertaining to that case. *See State v. Aderemi*, 2023 WI App 8, ¶7 n.3, 406 Wis. 2d 132, 986 N.W.2d 306, *review denied*, 2023 WI 75.

appeal that this line of questioning damaged Thompson's credibility because it seemed as though another jury had rejected his opinions; he contends his trial counsel should have objected. Instead, defense counsel on redirect attempted to rehabilitate Thompson by suggesting that there was overwhelming evidence against Orth for the count on which he was convicted—namely, Orth's confession to that crime. The jury had acquitted Orth on the second count, and a third had been dismissed on a defense motion.

¶14 The jury convicted Evans. At sentencing, the prosecutor stated that Evans went by the nickname "Burn-it-Down Bobby," conveying that Evans "[d]oesn't care about the rules." The circuit court identified punishment as the "primary objective" while also emphasizing the need to make clear "to society and our community we will protect the most vulnerable in our society." The court imposed a twenty-five year sentence, bifurcated as fifteen years' initial confinement and ten years' extended supervision.

¶15 Evans sought postconviction relief, asserting that he was entitled to a new trial or, alternatively, to resentencing. He alleged he had received ineffective assistance by his counsel's failure to explain the relevance of the testimony about Mike and Amy's financial problems, leading to the exclusion of relevant evidence that could have cast doubt on Mary's allegations. He also alleged his attorney was constitutionally ineffective by failing to object to the questioning about the outcome of *State v. Orth*. Finally, Evans argued resentencing was appropriate because the circuit court relied on inaccurate information "about [Evans's] supposed nickname and unwillingness to follow rules."

7

¶16     The circuit court denied the postconviction motion after a *Machner* hearing.[6]    Regarding evidence of the couple's financial problems, the court determined that even if counsel could have better explained the relevance, there was not a reasonable probability that evidence would have changed the outcome given the "overwhelming" evidence of Evans's guilt.  Likewise, as to Thompson's cross-examination and the results of the *Orth* litigation, the court concluded defense counsel likely should have objected but her failure to do so was not prejudicial.  The court considered the possible cumulative effect of the alleged errors and concluded they did not arise to a constitutional violation.  Finally, the court concluded Evans had failed to demonstrate the information at sentencing regarding Evans's nickname was inaccurate or relied on by the court in imposing sentence.  Evans now appeals.

## DISCUSSION

### I.    *Ineffective Assistance of Counsel*

¶17    The Sixth Amendment guarantees a defendant the effective assistance of counsel.  *State v. Savage*, 2020 WI 93, ¶27, 395 Wis. 2d 1, 951 N.W.2d 838.  We review an ineffective assistance of counsel claim using a mixed standard of review.  *Id.*, ¶25.  The circuit court's factual findings, including those regarding trial counsel's conduct and strategy, will not be overturned unless they are clearly erroneous, but we review de novo whether counsel's conduct constitutes constitutionally ineffective assistance.  *Id.*

---

[6] *See State v. Machner*, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).

¶18    To prevail on an ineffective assistance claim, the defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defendant. *Id.*; *see also* ***Strickland v. Washington***, 466 U.S. 668, 687 (1984). To demonstrate deficient performance, the defendant must show that his or her attorney made errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment. ***Savage***, 395 Wis. 2d 1, ¶28. We presume that counsel's conduct fell within the wide range of reasonable professional assistance, and we will grant relief only upon a showing that counsel's performance was objectively unreasonable under the circumstances. *Id.* Prejudice is demonstrated by showing a reasonable probability that, but for counsel's unprofessional conduct, the result of the proceeding would have been different. *Id.*, ¶32.

## A. Failure to Explain Relevancy of Evidence Regarding Financial Problems

¶19    At the ***Machner*** hearing, Evans's trial counsel testified her theory of the case was that Mike and Amy fought about money and Amy partially blamed Evans for "being in the home and spending time with [Mike], going out to bars with him[,] [k]ind of taking him away … from his family." Defense counsel theorized that the "rift in the marriage" caused Amy to misperceive events when she walked into the bedroom and she "jumped to the worst conclusion that she could possibly jump to." The defense view was that Amy's misperception then unintentionally transferred to Mary based on Amy's reactions and questioning.

¶20    Defense counsel conceded at the ***Machner*** hearing that she did not adequately explain this theory to the circuit court in response to the State's relevancy objection during Mike's cross-examination. The concession is not binding on this court, however. Our task is to judge the reasonableness of

counsel's conduct on the facts of the particular case, viewed as of the time of counsel's conduct, to determine whether the acts or omissions were "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690.

¶21 Here, defense counsel's explanation at trial was adequate to satisfy the demands of the Sixth Amendment. Counsel stated she wanted to question Mike about whether he was experiencing financial difficulties to provide context for the jury about the home environment at the time of the allegations against Evans—which is exactly the relevancy angle Evans argues on appeal. Although defense counsel at trial did not explicitly connect this to Amy's ability to accurately perceive the events she witnessed, Evans cites no authority on appeal establishing that counsel is constitutionally ineffective for failing to provide a more thorough or artful argument when the argument actually made conveys the core substance of the proposition.

¶22 Moreover, Evans has wholly failed to establish prejudice arising from any arguable deficient performance. First, he is not clear precisely what evidence his attorney should have presented at trial. In response to the State's objection, defense counsel noted that it was possible that Mike would deny that there were any "issues and other problems going on," but there was no offer of proof regarding evidence to the contrary. Evans's appellate brief is equally vague regarding what precisely the evidence of "marital and financial difficulties" would have consisted of.

¶23 Second, the nexus between the unspecified "marital and financial difficulties" and Amy's perception of the events she witnessed is not self-evident. Evans does not argue that stressors in the couple's life could have caused Amy to believe she saw something that did not actually happen. Instead, his argument is

that the discord in the household caused Amy to misunderstand or misinterpret the things that she actually witnessed. Although this was not an unreasonable trial argument, it is supported by no more than mere inference. We cannot deduce from such thin strands of reasoning that there is a reasonable probability the jury would have acquitted Evans if it had before it such vague notions of marital and financial trouble.

¶24 Third, to the extent Evans suggests the evidence could have provided context for Amy's interpretation of what she saw, the existing evidence was adequate for the jury to determine if Amy hastily drew inferences of criminal behavior from innocent conduct. Evans concedes—and our review of the trial transcript confirms—that the evidence "did show some tension" between Amy and Evans, thereby providing the jury with an adequate basis to question Amy's observations. Amy's 911 call following the sexual assault also permitted the jury to explore this matter. Amy told the operator she was sure of what she saw, but she was trying to figure out if it meant that something inappropriate had happened.

¶25 In sum, we are not persuaded that counsel made an error "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. Nor are we persuaded that there is a reasonable probability of a different outcome given Evans's failure to specify more precisely the evidence that was excluded, his failure to establish a nexus between the excluded evidence and Amy's perceptions as an eyewitness, and the fact that the jury was aware of the general discord in the household between Amy and Evans.

11

*B. Failure to Object to Cross-Examination of Evans's Child Memory Expert*

¶26    Next, Evans argues his trial counsel was constitutionally ineffective for failing to object to the prosecutor's cross-examination of Thompson regarding the outcome of the *Orth* litigation. The State addresses only the prejudice component of the *Strickland* analysis, noting that the circuit court concluded Evans's trial counsel should have objected on relevancy grounds. We agree with the circuit court and the State that Evans has failed to demonstrate prejudice arising from any arguably deficient performance.

¶27    Most significantly, any prejudicial effect arising from the State's questioning was largely ameliorated by defense counsel's redirect examination. During that questioning, Evans's attorney established that Orth had confessed to the crime for which he was convicted, making it much less likely the *Orth* jury had convicted Orth merely because it found that Thompson was an incredible witness.

¶28    Beyond that, the discussion of Thompson's testimony in the *Orth* case played an insignificant role when considered in the context of the entire trial record. Thompson's testimony was not highly supportive of Evans's defense; he could not opine that any interviewer had used suggestive questioning techniques, nor could he opine as to anything more than a possibility that Mary's memories had been tainted by external influences.

¶29    There was otherwise overwhelming evidence of Evans's guilt. As the circuit court noted, Mary's accusations were largely consistent throughout her trial testimony, her forensic interview, her interview with police, and her interview with her father. Her claims were supported by the eyewitness account of her mother and by DNA evidence. There is no reasonable probability of a different

12

outcome but for counsel's arguably deficient performance surrounding Thompsons' cross-examination.[7]

## II.    *New Trial in the Interest of Justice*

¶30    Evans next asserts we should exercise our WIS. STAT. § 752.35 power of discretionary reversal and order a new trial because the real controversy was not fully tried.  Evans argues that because of the two alleged errors addressed above, the jury did not have before it key evidence of Mike and Amy's financial and marital difficulties, and it had irrelevant evidence regarding the outcome of the *Orth* litigation that clouded the crucial issue of Evans's guilt.

¶31    We exercise our power of discretionary reversal only in exceptional cases.  *State v. Cameron*, 2016 WI App 54, ¶31, 370 Wis. 2d 661, 885 N.W.2d 611.  When the controversy has not been fully tried, we may exercise that power without finding there is a probability of a different result on retrial.  *State v. Klapps*, 2021 WI App 5, ¶34, 395 Wis. 2d 743, 954 N.W.2d 38.

¶32    Nonetheless, for reasons already set forth, we conclude this is not an exceptional case warranting the exercise of our discretionary reversal authority.  The jury was adequately presented with the defense argument that tension between

---

[7] Having concluded that Evans's trial counsel did not perform deficiently in relation to introducing the unspecified evidence of Mike and Amy's marital and financial difficulties, we do not need to address Evans's claim that he was cumulatively prejudiced by the alleged errors.

Separately, we note the State's statement of the case relies on portions of the criminal complaint that were never put into evidence at trial.  While the State provides accurate record citations for this material, it is unclear how the allegations in the criminal complaint are "relevant to the issues presented for review"—all of which are focused on the trial evidence or sentencing hearing.  *See* WIS. STAT. § 809.19(1)(d), (3)(a)2.  We remind the State of its obligations under § 809.19.

Amy and Evans may have affected her perception of what she saw. Additionally, the discussion during Thompson's testimony of *State v. Orth* played an insignificant role in the context of the entire trial.

### III. Resentencing Based on Inaccurate Information

¶33 Evans's final assertion is that he has never gone by the nickname "Burn-It-Down Bobby" and was therefore sentenced based on inaccurate information, in violation of his due process rights. *See State v. Coffee*, 2020 WI 1, ¶2, 389 Wis. 2d 627, 937 N.W.2d 579 (plurality opinion). A defendant bears the burden of showing by clear and convincing evidence that information presented at the sentencing hearing was inaccurate and that the circuit court actually relied on the inaccurate information when imposing sentence. *Id.*, ¶38. If the defendant does so, the burden shifts to the State to prove beyond a reasonable doubt that the error was harmless. *Id.* Whether a defendant has been sentenced in violation of his or her due process rights, and whether that error is harmless, are questions of law this court reviews de novo. *Id.*, ¶17.

¶34 Here, Evans has failed to demonstrate both that the information regarding his nickname was inaccurate and that the circuit court actually relied on that information when imposing sentence. Regarding the inaccuracy of the information, Evans merely points to the testimony of two longtime friends of both him and Mike, both of whom testified that they were unaware of the nickname. Evans posits that had he gone by and enjoyed the nickname, "one would expect he would have at least mentioned the nickname" to either individual. He also argues Mike—from whom the prosecutor learned of the nickname—had ample reason to fabricate. Even if there was reason for Mike to lie, the testimony of the two

witnesses does not establish by clear and convincing evidence that he was doing so, nor that Evans had never gone by the nickname.

¶35 Separately, Evans has failed to demonstrate that the circuit court relied on the information regarding his supposed nickname. To show reliance, Evans points to the circuit court's statements that it had listened to the parties' arguments and assessed Evans's character. This is insufficient to demonstrate actual reliance, which requires a showing that the court gave "explicit attention" or "specific consideration" to the misinformation. *State v. Tiepelman*, 2006 WI 66, ¶14, 291 Wis. 2d 179, 717 N.W.2d 1 (citation omitted).

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* Wis. Stat. Rule 809.23(1)(b)5.